**WELLS FARGO BANK, N. A., a corporation, Plaintiff and Respondent,**

v.

**MIDWEST REALTY & FINANCE, INC., a corporation, Defendant and Appellant.**

No. 14028.

Supreme Court of Utah.

Dec. 26, 1975.

Dean E. Conder, Nielsen, Conder, Hansen & Henriod, Richard H. Moffat and John L. Young, Moffat, Welling, Paulsen & Burningham, Salt Lake City, for defendant and appellant.

Randon W. Wilson, Robert M. McDonald and James S. Lowrie, Jones, Waldo, Holbrook & McDonough, Salt Lake City, for plaintiff and respondent.

CROCKETT, Justice:

Plaintiff, Wells Fargo Bank, sued defendant, Midwest Realty & Finance, Inc., to recover for loans made to defaulting Lee Chair Corporation, for which Midwest had signed two successive guaranty agreements, one in November, 1970, for $60,000; and another in December, 1970, for $130,000. Midwest's defense was that by a letter quoted below, it had notified Wells Fargo of its revocation of the guaranty, as permitted by the contract, before Wells Fargo had continued to advance the money for which now it sues. A trial to the court resulted in findings and judgment in favor of the plaintiff for $59,000 on guaranty No. 1 and $8,800 on guaranty No. 2, plus interest of about $23,000, attorneys' fees and costs. Defendant appeals.

In 1970, Midwest was contemplating a corporate consolidation involving a merger with Lee Chair, which was in need of financial assistance. To obtain this assistance, Midwest contacted Wells Fargo, which agreed to loan $60,000 to Lee Chair on a promissory note, provided defendant Midwest would guarantee payment. By appropriate action of Midwest's board of directors, the guaranty which we refer to as guaranty No. 1 was executed on November 4, 1970. It was a continuing guaranty which authorized the bank to "renew, extend or accelerate the terms of the indebtedness . . . without notice or demand . . ." to the guarantor (Midwest). The guaranty also provided that "This guaranty shall not apply to any indebtedness created after actual receipt by Bank [Wells Fargo] of written notice of its revocation as to future transactions." This guaranty, as well as one subsequently executed, contained the following:

> The obligations of Guarantors hereunder shall be in addition to any obligations of Guarantors, under any guarantys of the indebtedness of Borrowers or any other persons heretofore given or hereafter to be given to Bank unless said other guarantys are expressly modified or revoked in writing, and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guarantys.

Almost immediately after the transaction just described, and the execution of guaranty No. 1, it was decided that Lee Chair needed additional financing. Accordingly, the following month, on December 17, 1970, Midwest executed a second guaranty in the same terms, which we refer to as guaranty No. 2. It provided that plaintiff Wells Fargo could advance money to Lee Chair up to $130,000. But this one was also secured by assignment of Lee Chair's accounts receivable.

By July of 1971, plaintiff Wells Fargo had extended credits under these guarantys to the extent of the $60,000 under guaranty No. 1 and additional advances of about $32,500 under guaranty No. 2. On July 8, 1971, Midwest sent to Wells Fargo the letter which is of crucial importance in this case, because Midwest relies upon it as releasing it from its guaranties. The pertinent part states:

> During the recent meeting of the Board of Directors of Midwest Realty and Finance, we reviewed our financial commitments. It was the decision of the

Board that *we will withdraw the "Continuing Guaranty"* of Midwest Realty & Finance, Inc., for and in behalf of L.E. E. Chair Corporation. This guaranty is dated December 17, 1970, and is in the amount of $130,000.00.

It is our desire that the guaranty be *immediately reduced* to the amount of the *outstanding obligations* covered by the L.E.E. Chair note. We believe this to be about $85,000.00.

We would appreciate your earliest reply, indicating any further requirements for *finalizing this cancellation.*

■■ In approaching the problem as to whether the defendant should be deemed to have revoked and was, therefore, released from liability under its guaranties, there is this fundamental proposition to be kept in mind: By duly executing these continuing guaranties, knowing that others (primarily Lee Chair and plaintiff Wells Fargo Bank), would rely and act thereon, defendant became bound thereby until the guaranties were properly revoked or terminated.[1] While this could be done by written notice, it is only fair and reasonable that the notice must be clear and unequivocal.

The first contention Midwest makes to escape liability under its guaranties is this: That inasmuch as guaranty No. 2 of $130,000 was given after the guaranty No. 1 for $60,000, the latter should be deemed to supplant the former and leave defendant liable only under guaranty No. 2. This contention is effectively refuted by the terms of those guaranties as quoted above. They expressly recite that "the obligations of guarantors [Midwest] hereunder shall be in addition to any obligations of guarantors . . . heretofore given or hereafter to be given to the Bank [Wells Fargo] unless . . . expressly modified or revoked in writing; and . . . shall not . . . affect or invalidate any such other guaranties."

■ Further, in regard to guaranty No. 1, it will be noted that the defendant's letter of July 8, 1971, quoted above, makes no definite reference to that guaranty. It does speak specifically of the guaranty dated December 17, 1970, . . . in the amount of $130,000. Considering the two observations just made together, we see no basis upon which it could be concluded that defendant Midwest gave a clear and definite notice of revocation of its guaranty No. 1. The trial court was, therefore, amply justified in ruling that Midwest remained bound on that guaranty on the $60,000 note. The evidence is that timely interest payments have been made thereon and that it had been renewed several times: on February 11, 1971; May 18, 1971; August 4, 1971; September 22, 1971; and February 4, 1972. The principal was reduced by $1,000, leaving a $59,000 principal balance.

■ We turn our attention to the effect Midwest's letter of July 8, 1971, quoted above, may have on guaranty No. 2. As just pointed out, that letter refers expressly to the "guaranty . . . dated December 17, 1970, . . . in the amount of $130,000."

The first paragraph states: *"We will withdraw* the 'Continuing Guaranty'"; whereas the following paragraph states that: "The guaranty be *immediately reduced* . . . to the amount of the outstanding obligations . . . we believe this to be about $85,000.00." Due to the inconsistencies in the quoted phrases, it must be conceded that this letter does not give any clear and definite notice of revocation of guaranty No. 2. Rather, its language gives rise to the question whether, as Midwest contends, it was attempting to revoke its guaranty completely; and that Wells Fargo should not thereafter have advanced any more money in reliance thereon; or, as plaintiff argues: the reasonable interpretation of that letter is that

1. *Gen. Appliance v. Haw, Inc.*, 30 Utah 2d 238, 516 P.2d 346, *Ephraim Theatre v. Hawk*, 7 Utah 2d 163, 321 P.2d 221.

it was "capping," that is, putting a limit on the amount of guaranty to the then outstanding obligations, "believed to be about $85,000." This seems to be a rough approximation, which would include the $59,000 on guaranty No. 1, plus the then-outstanding obligations under guaranty No. 2 which the evidence shows was about $32,500 at the time Wells Fargo received the letter.

Wells Fargo concedes notice of the limitation as stated in the letter and that it continued to extend credit on Lee Chair's financing in accordance therewith. The evidence is that on the same day Wells Fargo received the letter there was a telephone conversation between Walter J. Winrow of Wells Fargo and John G. Wells of Midwest. The testimony is in conflict as to what was said. Wells Fargo's version is that Mr. Wells explained that the letter was to "cap" the borrowing at the limit of the current balance believed to be $85,000, rather than to cancel the guaranty as to any future loans. Whereas, the defendant's evidence was (a) that Mr. Wells, though a member of the board of directors, was not a managing officer and, therefore could not speak for Midwest; and (b) that he did not make any such statement anyway, but that what he said was in harmony with the position of Midwest: that the letter was intended to terminate any further extension of credit under its guaranties.

In addition to the foregoing disputed conversation, in its admittedly belated responsive letter, sent on September 21, 1972, Wells Fargo explained its understanding of the lowering of the guaranty limit from $130,000 to the amount of the outstanding obligations at the time the letter was received. That letter stated in part:

Lee Chair Corporation is presently indebted to Wells Fargo Bank in the amount of $77,461.86. This is broken down as follows: $59,000.00 unsecured

note and $18,461.86 in the form of accounts receivable financing. The accounts receivable line is still in effect so that balance may fluctuate. However, the maximum has been capped at $32,500.00. We have continued to allow this borrowing because if we cease to allow it, it would result in the closing of the business, thereby eliminating any possibility of their repaying the other note.

Plaintiff continued to extend credit in accordance with its understanding and the limitations as stated in this letter just quoted. As time passed, Lee Chair became increasingly unable to respond to its obligations and Wells Fargo turned to Midwest for payment pursuant to its guaranties. As of August 16, 1973, the amount owing under the guaranties was still the $59,000 under guaranty No. 1, and was $8,874.26 under guaranty No. 2. Upon the failure of Midwest to comply with plaintiff's request, this suit was instituted, which resulted in the findings of fact and judgment for the plaintiff.

In regard to defendant's attack upon the trial court's findings and judgment, these observations are pertinent: It may be that the person who wrote the so-called revocation letter of July 8, 1971, for Midwest knew what he had in mind. But after trying to analyze and reconcile the evidence and the contentions of the respective parties as to what they think it meant, it is obvious that it falls short of being a clear and definite communication to others. In dealing with a document which is ambiguous or uncertain, the general rule is that it should be construed strictly against the party who wrote it (Midwest) and favorably to the other party against whom it is invoked (Wells Fargo).[2] Further, when a document is of that character, the trial court can take extraneous evidence and look to the total circumstances to determine what the parties should reasonably be deemed to have understood thereby.[3]

2. *Cont. Bk & Trust Co. v. Bybee*, 6 Utah 2d 98, 306 P.2d 773.

3. *Western Dev. Co. v. Nell*, 4 Utah 2d 112, 288 P.2d 452.

These principles are to be considered together with this further proposition: that where there was dispute, it is the prerogative of the trial court to determine whose evidence he will believe.[4]

 When the record is surveyed in the light of those rules, it is our opinion that the plaintiff Midwest has failed in its burden of showing that there is undisputed evidence which compells a finding as a matter of law that it had revoked its guaranties and should not be held liable thereunder. Accordingly, there is no basis upon which we can properly reverse the trial court's findings and judgment. (All emphasis added).

Affirmed. Costs to plaintiff (respondent).

HENRIOD, C. J., and ELLETT, TUCKETT and MAUGHAN, JJ., concur.

4. *Zuniga v. Evans*, 87 Utah 198, 48 P.2d 513.