**Gilbert R. WILBURN, Plaintiff,**

v.

**INTERSTATE ELECTRIC, National Union Fire Insurance Company of Pittsburgh and Second Injury Fund, Defendants.**

No. 860292–CA.

Court of Appeals of Utah.

Jan. 19, 1988.

---

Michael E. Dyer, Stephanie A. Mallory (argued), Richards, Brandt, Miller & Nelson, Salt Lake City, for plaintiff.

Stuart L. Poelman (argued), Snow, Christensen & Martineau, Salt Lake City, for Interstate Elec. & Nat'l Union.

Erie V. Boorman (argued), Second Injury Fund, Salt Lake City.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Plaintiff Wilburn appeals from an Industrial Commission order denying his application for permanent total disability benefits under Utah's Workers' Compensation laws. The Commission's decision was premised on the ground that plaintiff had previously compromised and settled his claim. Plaintiff seeks reversal of the Commission's order and an award of permanent total disability benefits. We affirm.

## FACTS

Plaintiff worked at Interstate Electric as a heavy duty mechanic repairing and overhauling portable power plants, water pumps, and hydraulic telephone pullers. On April 14, 1980, plaintiff injured his back while trying to lift a portable powerplant from the floor to his work bench. Plaintiff continued working the remainder of the day as well as the two following days. When the pain did not subside, he consulted a doctor. After missing a few days of work, he continued working for the rest of the year with no other medical treatment.

On February 2, 1981, Interstate Electric's insurance carrier, defendant National Union, had plaintiff submit to an independent physical examination, which resulted in a permanent partial impairment rating of 20%. Fifteen percent of the impairment was attributable to preexisting causes, paid by the Second Injury Fund, and 5% attributable to aggravation of the preexisting condition by the industrial accident, paid by Interstate Electric. Plaintiff continued working until he was laid off on July 31, 1981. Following another examination, he was placed on temporary total disability on August 18, 1981. On June 20, 1983, plaintiff was reexamined and received a permanent partial impairment rating of 36%, with 10% attributable to the industrial accident, 15% to preexisting problems in his lumbar and lumbosacral spine, and 15% to a non-industrial cervical spine condition.

In late 1983, plaintiff consulted an administrative law judge who advised him to make a claim for permanent total disability. Plaintiff contacted Interstate Electric's carrier, asserted his claim, and was referred to the carrier's attorney. The attorney told plaintiff that if he claimed permanent total disability, Interstate Electric would raise several defenses, including the "no accident" defense, and if it prevailed, plaintiff would lose his claim for all additional compensation. Plaintiff then agreed to settle for an additional 10% permanent partial disability. Upon receiving a written Compromise and Settlement Agreement, plaintiff consulted with an Industrial Commission attorney, and as a result, asked that the agreement contain an additional $1,590.00 for temporary total disability benefits during the fall of 1983. The agreement was revised as requested, signed by both parties, and approved by the Industrial Commission in November 1984. Defendants then paid plaintiff as required in the agreement.

Despite the agreement, in early 1986 plaintiff filed an application with the Industrial Commission seeking permanent total disability compensation from defendants. A hearing was held on the application and the administrative law judge issued his "Interim Findings of Fact, Conclusions of Law and Order" on May 28, 1986, in which he expressed "no doubt" as to the compensability of plaintiff's claim, found him to be permanently and totally disabled, and imposed liability for permanent total disability upon defendants. Defendants filed a "Motion for Review and Clarification" and the administrative law judge then issued his "Supplemental Findings of Fact, Conclusions of Law and Order," vacating his prior order. Specifically, the judge found that, while he would have held that Wilburn sustained a "compensable accident," there was a bona fide dispute as to defendants' liability for plaintiff's alleged industrial injury. The Compromise and Settlement Agreement was therefore binding and barred plaintiff's claim for permanent total disability compensation.

On appeal, plaintiff argues that he did not release his claim for permanent total disability benefits upon signing the Compromise and Settlement Agreement and, if his claim was released by the agreement, that the settlement was void as against public policy and in violation of Utah Code Ann. § 35-1-90 (1974).

## SETTLEMENT AGREEMENT

We first address the issue of whether the agreement between the parties settled plaintiff's claim for permanent total disability benefits. When a contract is unambiguous, its interpretation is a question of law. *See, e.g., Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *Seashores Inc. v. Hancey,* 738 P.2d 645 (Utah Ct.App.1987).

If it is ambiguous,—and the determination of whether or not a contract is ambiguous is itself a question of law—extrinsic evidence as to the parties' intent must be received and considered in an effort to glean what the parties actually agreed to. *Seashores Inc. v. Hancey,* 738 P.2d at 647. If a trial court interprets a contract as a matter of law, on appeal the trial court's resolution is afforded no particular deference. *Id.* On the other hand, if the contract is ambiguous and the trial forum finds facts respecting the intention of the parties based on extrinsic evidence, then appellate review is strictly limited and the findings and judgment of the trier will not be disturbed if based on substantial, competent, admissible evidence. *Id.;* Utah R.Civ.P. 52.

■ Accordingly, we must first determine, as a matter of law, whether the contract is ambiguous. Plaintiff argues that the Compromise and Settlement Agreement is unambiguous in its release of only his claim for temporary total disability and permanent partial disability benefits since it does not specifically mention permanent total disability. The difficulty with this position is that the contract does not refer specifically even to the claims defendant concedes were released by the document. Thus, while it is clear the parties meant to settle something, it is unclear what claim or claims they meant to settle.

Since the contract is ambiguous, it was appropriate for the administrative law judge to consider extrinsic evidence in an effort to find the intentions of the parties in entering into the agreement. Plaintiff argues, however, that the extrinsic evidence in this case does not support a finding that the agreement contemplated a release of his permanent total disability claim. In this regard, plaintiff urges application of the doctrine that ambiguities in a contract should be construed against the party responsible for its drafting.

### A. *Construction Against Drafter*

■ Plaintiff misapprehends the doctrine that contracts should be construed against the drafter.[1] The doctrine does not operate in dispositive fashion simply because ambiguity has been found. Once a contract is deemed ambiguous, the next order of business is to admit extrinsic evidence to aid in interpretation of the contract. It is only after extrinsic evidence is considered and the court is still uncertain as to the intention of the parties that ambiguities should be construed against the drafter.[2] In other words, the doctrine of construing ambiguities in a contract against the drafter functions as a kind of tie-breaker, used as a last resort by the fact-finder after the receipt and consideration of all pertinent extrinsic evidence has left unresolved what the parties actually intended. This rule has been summarized as follows:

1. Several Utah cases have invoked the doctrine but have typically not elaborated on its proper role. *See, e.g., Sears v. Riemersma,* 655 P.2d 1105, 1107 (Utah 1982) ("The well-established rule in Utah is that any uncertainty with respect to construction of a contract should be resolved against the party who had drawn the agreement."); *Parks Enters., Inc. v. New Century Realty, Inc.,* 652 P.2d 918, 920 (Utah 1982) ("It is also settled law that a contract will be construed against the drafter."); *In re Estate of Orris,* 622 P.2d 337, 339 (Utah 1980) (language of an ambiguous instrument should be construed most strictly against the party who drafted the instrument). The case of *Wells Fargo Bank v. Midwest Realty & Fin., Inc.,* 544 P.2d 882 (Utah 1975), recognizes that where a document is ambiguous, it is appropriate to construe it "strictly against the party who wrote it," but also appropriate to "take extraneous evidence and look to the total circumstances to determine what the

parties should reasonably be deemed to have understood thereby." *Id.* at 885. While the opinion does not say so, it is obvious there is nothing left to construe—"strictly against the party who wrote it" or otherwise—if extraneous evidence clearly establishes "what the parties should reasonably be deemed to have understood" in executing an agreement.

2. There are arguable exceptions to this rule, including where insurance and surety contracts are concerned. *See, e.g., Shelter America Corp. v. Ohio Cas. & Ins. Co.,* 745 P.2d 843 (Utah Ct.App. 1987). However, such exceptions may be explained, at least in part, by the fact that such contracts are ordinarily not preceded by discussion or negotiation of specific terms and, thus, absent meaningful extrinsic evidence as to intent, recourse must be had directly to the maxim that ambiguities should be construed against the drafter.

After applying all of the ordinary processes of interpretation, including all existing usages, general, local, technical, trade, and the custom and agreement of the two parties with each other, having admitted in evidence and duly weighed all the relevant circumstances and communications between the parties, there may still be doubt as to the meaning that should be given and made effective by the court. If ... the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is less favorable in its legal effect to the party who chose the words.

3 A. Corbin, *Corbin on Contracts* § 559 (1960).

### B. *Extrinsic Evidence*

■ In this case, the judge received extrinsic evidence, including testimony of the Commission's former legal counsel who approved the agreement, plaintiff's own testimony, and other testimony on the circumstances surrounding the execution of the Compromise and Settlement Agreement, and concluded, as a matter of fact, that the agreement was validly executed by the parties as a settlement of a disputed claim, including for permanent total disability benefits. Although the evidence was in conflict, ample evidence supports the judge's findings in this regard.

Reviewing the record, we have some doubt about whether the decision reached by the judge was the fairest or the most appropriate in view of the extrinsic evidence. However, our approval or disapproval of the substantive decision reached is largely irrelevant. "[W]e give maximum deference to the basic facts determined by the agency, which will be sustained if there is evidence of any substance that can be reasonably regarded as supporting the determination made." *Wilson v. Industrial Comm'n*, 735 P.2d 403, 405 (Utah Ct.App. 1987) (citing *Allen & Assoc. v. Industrial Comm'n*, 732 P.2d 508, 508–09 (Utah 1987)). Deference, always due by appellate courts to fact-finders, is maximized where, as here, the Legislature has comprehen-

sively delegated responsibility over a particular subject to a specialized administrative agency. Utah Code Ann. § 35–1–16 (1987). *See, e.g., Department of Admin. Servs. v. Public Serv. Comm'n*, 658 P.2d 601, 608–10 (Utah 1983); *Central Bank & Trust Co. v. Brimhall*, 28 Utah 2d 14, 16, 497 P.2d 638, 641 (1972).

### SECTION 35–1–90

Notwithstanding the ambiguity of the contract and the findings of the administrative law judge, plaintiff argues that the agreement is nonetheless void as against public policy and in violation of § 35–1–90 of Utah's Workers' Compensation statutes. Section 35–1–90 provides, in relevant part: "No agreement by an employee to waive his rights to compensation under this title shall be valid." Utah Code Ann. § 35–1–90 (1974).

■ Under this provision, settlements are appropriate only when the compensable nature of the worker's injury is disputed and the worker's right to recover is doubtful. *See Brigham Young Univ. v. Industrial Comm'n*, 74 Utah 349, 279 P. 889 (1929). Conversely, when the compensability of a workers' compensation claim is not disputed, an employee cannot waive his claim by agreement. *Barber Asphalt Corp. v. Industrial Comm'n*, 103 Utah 371, 135 P.2d 266 (1943).

■ The administrative law judge in this case focused on the effect of these two cases on plaintiff's claim and determined that the settlement should be enforced only if there had been a bona fide dispute as to the compensability of plaintiff's claim. Recognizing that the issue was not so much whether the judge believed the applicant sustained a compensable accident as it was a matter of what the parties believed and acted upon, the administrative law judge reversed his initial, tentative decision and found that the Compromise and Settlement Agreement was validly executed by the parties as a settlement of a disputed claim, including for permanent total disability, and was not in violation of § 35–1–90.

While we would have no difficulty in finding the applicant's claim compensable,

we agree with the administrative law judge that this determination cannot "supplant the judgment of those who earlier, in good faith, viewed this claim as one of doubtful compensability."[3] Since there is sufficient evidence to support the judge's finding that the parties had a good faith dispute as to the compensability of the claim, we defer to that determination. In view of that finding, § 35-1-90 is no bar to enforceability of the agreement.

## TOWARDS A MORE REGULAR PROCEDURE

■ We acknowledge, as did the administrative law judge, the "harsh consequences" of this decision but agree that "compassion for the Applicant does not justify the erosion of a principle and policy pertaining to compensation agreements generally." The parties tell us that it has been the policy of the Industrial Commission to encourage the settlement of claims and that it has been the practice of the Commission to approve settlement agreements before their execution. The Legislature specifically granted to the Industrial Commission the power and authority to promote the expedited resolution of claims under the Workers' Compensation statutes. Section 35-1-16 provides:

> It shall be the duty of the commission, and it shall have full power, jurisdiction, and authority:
>
> ....
>
> (5) To promote the voluntary arbitration, mediation and conciliation of disputes between employers and employees.[4]

Utah Code Ann. § 35-1-16 (1974).

The Commission is likewise vested with the authority to promulgate rules for governing these procedures. Utah Code Ann. § 35-1-10 (1974). Clearly, then, the Commission has the prerogative to adopt regulations governing the settlement of claims. Implicit in the Commission's practice of reviewing proposed settlements is the concomitant responsibility of the Commission to assure that an applicant is aware of the scope and consequences of his or her settlement agreement. Moreover, when important rights are at issue, they should not be left to the vagaries of self-serving recall. If it is true, as defendants suggest, that the Industrial Commission approves as many as fifty of these settlements a year, then the Commission should implement a process which will operate, as the administrative law judge stated, to "safeguard against abuses that might otherwise occur, if an unscrupulous employer or insurance carrier attempt[s] to take advantage of an unsophisticated worker seeking to settle a claim without the advice of counsel."

■ It seems to us that the Commission should formalize its long-standing practice of getting involved in the settlement of claims. Pursuant to its rule making authority, the Commission should adopt procedures defining its role in settlements. To help avoid disputes like the instant one, it might, by rule, require the use of a standard, unambiguous form specifically delineating which claims are released and which, if any, are preserved by the agreement.[5] While such a regularized process of review and approval of settlements by the Commission seems clearly preferable, we cannot say the failure heretofore to have adopted such a process is so arbitrary

---

**3.** Interstate Electric's argument about the "compensability" of Wilburn's claim was not altogether implausible given the state of flux surrounding the definition of "accident" at the time plaintiff's claim was filed. *See, e.g., Allen v. Industrial Comm'n,* 729 P.2d 15 (Utah 1986).

**4.** Subsequent legislation has changed the format of, but not the language quoted from, § 35-1-16. *See* Utah Code Ann. § 35-1-16(1)(e) (1987).

**5.** The Commission has developed a "Compensation Agreement" form. "This form is used by the parties to a workers' compensation claim to enter into an agreement as to a permanent partial impairment award, and must be submitted to the Commission for approval." Workers' Compensation Rules and Regulations § R490-1-2(P) (effective March 4, 1986, as amended). The "Compensation Agreement," the Commission's Form 019, is used in situations where there is no dispute about the occurrence or compensability of an accident to document that a claimant "accepts the compensation and Medical payments paid to date and agrees with the permanent partial disability rating shown above."

and capricious as to warrant reversal in this case.

The Industrial Commission's order is affirmed.

GARFF and JACKSON, JJ., concur.