The FIRST NATIONAL BANK AND TRUST COMPANY OF DICKINSON, Plaintiff and Appellee,

v.

MEYER ENTERPRISES, INC., J.A. Anderson, Inc., Indian Creek Investments, Inc., K.W. Investments, Inc., DeMonbrun, Inc., James W. Anderson, Howard H. Hutson, Kenneth W. Schmidt, Jr., and Robert DeMonbrun, Defendants,

Donald L. Sessions, Lois R. Sessions, and Dana Investment Co., Defendants and Appellants.

Civ. No. 870235.

Supreme Court of North Dakota.

July 19, 1988.

Kelsch, Kelsch, Ruff & Austin, Collins and Main, Mandan, for plaintiff and appellee First Nat. Bank and Trust Co. of Dickinson; argued by William C. Kelsch.

Rausch & Rausch, Bismarck, for defendants and appellants; argued by James P. Rausch.

Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, for defendant Meyer Enterprises, Inc. No briefs filed. No appearance.

Zuger, Kirmis, Bolinske & Smith, Bismarck, for defendants J.A. Anderson, Inc., Indian Creek Investments, Inc., K.W. Investments, Inc., DeMonbrun, Inc., James W. Anderson, Howard H. Hutson, Kenneth W. Schmidt, Jr., and Robert DeMonbrun. No briefs filed. No appearance.

MESCHKE, Justice.

Donald L. Sessions, Lois R. Sessions, and Dana Investment Co. [collectively, "Sessionses"] appealed from a money judgment in favor of First National Bank, based on a contract of guaranty. They claimed novation, revocation and exoneration. We affirm.

The Dickinson Energy Center ["DEC"] was created to develop real estate in Dickinson, North Dakota. Meyer Enterprises, Inc. and Evanston Industrial Center were equal partners in the venture. Evanston Industrial Center was itself a partnership made up of five corporations, including Dana Investment Co., owned by Donald L. Sessions and Lois R. Sessions. First National Bank extended a line of credit to DEC. The Bank required and obtained, on April 2, 1981, guaranties for $1,000,000 from the Sessionses, the other corporations composing Evanston Industrial Center, and Meyer Enterprises, Inc.

The Bank advanced $75,000 and $500,000 to DEC. By September 1981, both notes were paid off by issuance of municipal industrial development bonds for the project. Meanwhile, Dana Investment Co. withdrew from the Evanston partnership, selling its interest to the remaining partners. The Bank was notified of this by Evanston and was asked to remove Donald Sessions' name from the DEC account.

Thereafter, the Bank made DEC another loan for $200,000. In April 1982, that loan was made a part of a loan of $500,000 due in 1983. All the original guarantors, except Sessionses, executed new guaranties on October 4, 1983, for $400,000, the amount of the then-existing debt. Sessionses were not contacted by the Bank. A December 1983 promissory note for $400,-000 renewed the debt.

DEC did not pay the debt when due. The Bank sued all of the guarantors for payment. The trial court found "the guaranties have never been revoked" and gave judgment to the Bank against all the guarantors for $535,604.94 including interest and costs. The trial court also gave Sessionses an equivalent cross-claim judgment against the four individuals who were principals in the other four corporate partners of Evanston, based on an indemnity provision of their agreement with Sessionses.

Only Sessionses appealed. They argued that the trial court's determinations, that a substitution of guaranties had not occurred and that Sessionses' guaranties were not revoked or exonerated, were both clearly erroneous.

The 1981 and 1983 guaranties, varying only in amount, said:

"This guaranty is an absolute and completed one and shall be a continuing one and no notice of any indebtedness already or hereafter contracted or acquired by the Bank, or of any renewal or extension of any thereof need be given.... Each of the undersigned hereby expressly waives demand, presentment, protest and notice of dishonor on any and all forms of such indebtedness...."

". . . .

"Each of the undersigned acknowledges that this guaranty ... shall continue in full force and effect notwithstanding the ... release of or the extension of time to any of the other guarantors, both as to indebtedness then existing and/or thereafter created. Each of the undersigned agrees that this guaranty shall continue in effect, notwithstanding that from time to time no indebtedness from the Debtor to the Bank may exist, and that his liability upon this guaranty shall be terminated only upon receipt by the Bank of written notice of revocation from him ... and that ... his liability hereon shall continue as to indebtedness then existing and as to any and all renewals or extensions thereof made after such event[ ]."

A guaranty is "a promise to answer for the debt, default, or miscarriage of another person." NDCC 22-01-01. A continuing guaranty is "a guaranty relating to a future liability of the principal under successive transactions which either continue his liability or from time to time renew it after it has been satisfied." *Id.*[1] " '[W]here a guaranty is continuing and absolute, the guarantor is not entitled to notice of each transaction in order to bind him. The statement that the guaranty is unconditional waives notice unless it is specifically provided for in writing.' " *State Bank of Burleigh County v. Porter,* 167 N.W.2d 527, 536 (N.D.1969), quoting from *Hirning v. Jacobsen,* 51 S.D. 270, 213 N.W. 505 (1927).

Sessionses argued that a substitution or novation occurred when the Bank obtained new guaranties of $400,000 from the other guarantors in 1983, and that the Bank intended that the new guaranties take the place of the $1,000,000 guaranties in 1981.

"Novation is the substitution of a new obligation for an existing one." NDCC 9-13-08. A novation can be effected in several ways:

"*How novation made.* Novation is made by the substitution of:

"1. A new obligation between the same parties with intent to extinguish the old obligation;

"2. A new debtor in the place of the old one with intent to release the latter; or

"3. A new creditor in place of the old one with intent to transfer the rights of the latter to the former." NDCC 9-13-10.

Whether a novation has occurred is a question of fact, and thus subject to the clearly erroneous standard on review. *Herb Hill Ins., Inc. v. Radtke,* 380 N.W.2d 651, 654 (N.D.1986). The trial court determined that "[t]here is no evidence that the parties intended to substitute the ... 1983 guaranties for the ... 1981 guaranties."

Sessionses argued that the trial court ignored "common sense inferences" from the actions of the parties and misinterpreted testimony. However, "[t]he district court is the ultimate arbiter of the credibility of the witnesses and the weight to be given their testimony, and, when more than one reasonable inference can be drawn from credible evidence, the reviewing court must accept the inference drawn by the trier of fact." *Herb Hill, supra* at 653. "The mere fact that the appellate court might have viewed the facts differently had it been the initial trier of the case does not entitle it to reverse the lower court." *Id.*

▪ The record is unclear as to why the new guaranties were signed. A loan officer of the bank testified:

"Q What was the purpose for securing additional guaranties in 1983?

"A It doesn't—it doesn't matter how many more guaranties you get. The more you have, I suppose, the merrier."

"A novation is created by the substitution of a new obligation between the *same*

---

1. A bill introduced in the 1987 legislative session would have limited continuing guaranties. HB 1567 would have amended NDCC 22-01-15 to exonerate a guarantor if "As to a continuing guaranty, regardless of provisions in the guaranty to the contrary, there is an extension, renewal, modification, or novation of the original obligation." However, the bill did not pass. *See* Senate Journal 1801-02, Fiftieth Leg.Sess. (1987).

parties with the *intent to extinguish the old obligation....* [T]here must also exist mutual assent and sufficient consideration." *North Dakota Public Serv. v. Valley Farmers,* 365 N.W.2d 528, 543 (N.D. 1985) (emphasis added). It is apparent that no new obligation was substituted between Sessionses and the Bank. Nor is intent clear, since Sessionses did not know of or participate in the signing of the later guaranties. The trial court had full opportunity to gauge the witnesses' credibility. In a case, as here, so dependent on weighing of testimony, we will not second guess the trial court unless we conclude it was clearly erroneous. We are unpersuaded that this trial court erred in finding that no substitution of guaranties took place.

For a comparable decision, *see Alton Banking & Trust Co. v. Schweitzer,* 121 Ill.App.3d 629, 77 Ill.Dec. 246, 460 N.E.2d 105 (5 Dist.1984). *Compare First American National Bank of Nashville v. Hall,* 579 S.W.2d 864 (Tenn.Ct.App.1979) (despite "noticeable absence of proof ... on the factual issue," evidence did not preponderate against a trial court finding that second guaranty signed by current partners was intended to replace the previous guaranty, and that ex-partner was thus not liable under original guaranty).

■ Sessionses also argued that their guaranty, even though it expressly required a written revocation, was revoked by other, legally sufficient means. However, most courts adhere firmly to the requirement of written revocation, whether or not an oral notice was given. *See Houin v. Bremen State Bank,* 495 N.E.2d 753, 759 (Ind.App.3 Dist.1986); *Hardware Wholesalers, Inc. v. Guilbeau,* 473 So.2d 108 (La.App.3 Cir.1985) (reversing trial court judgment for guarantors); *Milliken and Co. v. Eagle Packaging Co.,* 295 N.W. 2d 377 (Minn.1980) (reversing trial court judgment for guarantors); *Browning v. National Bank of Georgia,* 143 Ga.App. 278, 238 S.E.2d 275 (1977); *Chemical Bank v. Wasserman,* 37 N.Y.2d 249, 371 N.Y.S. 2d 919, 333 N.E.2d 187 (1975). *But see*

*Bridgeport State Bank v. Union Warehouse & Milling Co.,* 137 Wash. 190, 242 P. 13 (1926) (written revocation not necessary where substitution was intended and occurred after direct contact between bank and guarantors); *First American National Bank of Nashville v. Hall, supra.*

Sessionses pointed out that the Bank was notified that Donald Sessions was no longer associated with the Evanston partnership, and that a representative of the partnership mentioned to the Bank that Donald Sessions was not guarantying the later loan. Sessionses argued that these communications served "to effect a valid revocation of the guaranties given," especially in light of attendant circumstances. But, notice of Sessionses' withdrawal from the partnership alerted the Bank only to a change in account signature cards. Generally, a change in business relationship does not affect a personal guaranty. *See Hardware Wholesalers, Inc. v. Guilbeau, supra; Cudahy Foods Company v. Rich Plan of Baton Rouge, Inc.,* 349 So.2d 894 (La.App.1977); *Brunzell v. Golden Gate National Bank,* 85 Nev. 345, 455 P.2d 31 (1969); and *Haynie v. First National Bank of Atlanta,* 117 Ga.App. 766, 162 S.E.2d 27 (1968).

Sessionses seemed to assert that their withdrawal from the partnership would clearly signal an end to any financial interest in the Evanston partnership. However, Donald Sessions testified otherwise:

"Q Is it fair to say that you have had and still have a rather substantial economic interest in the outcome or success of Evanston Industrial Center and its various partnerships?

"A Oh, I'm—I have an interest. I have a debt they owe me, yes.

"Q A substantial sum?

"A Yes."

Sessionses agreed to subordinate this debt due from Evanston to all loans and obligations of Evanston including those incurred after Dana withdrew. Thus, Sessionses had a continuing interest in the financial affairs of Evanston.[2]

2. In light of a similar assertion, another court   commented that:

■ Sessionses also skirt the fact that there was never any direct communication, written or oral, between Sessionses and the Bank about revocation of the guaranties. "A revocation of a continuing guaranty must be executed by the guarantor who seeks to effect its revocation." *Brunzell v. Golden Gate National Bank, supra* 455 P.2d at 32. Sessions testified that, at a September 2, 1981 meeting with the Bank president, Sessions told him that he wanted any association with DEC and Evanston terminated, and the president said that he would "take care of it." But Sessions also testified that, at that time, he was not even thinking of the guaranty he had signed because "I felt that the guaranty had been fulfilled and the first loan payment was paid off."[3] Even where a bank has not performed as the guarantor expected, the requirement for written revocation remains. *See Security National Bank v. Sloan,* 58 Or.App. 316, 648 P.2d 861 (1982).

Sessionses also argued that the guaranty was revoked by substitution. Since the trial court found that no substitution occurred, and we have affirmed that finding, there could be no concomitant revocation. We do not view the trial court's factual determinations, that no revocation or exoneration occurred, as clearly erroneous. The guaranty required a written revocation, and none was given. *See Wells Fargo Bank, N.A. v. Midwest Realty & Finance, Inc.,* 544 P.2d 882 (Ut.1975).

We affirm the trial court's judgment holding Sessionses liable on their guaranty.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and MESCHKE, JJ., concur.

"Defendants' arguments seem to assume that notice of the sale of their ownership interest in Hotel amounted to notice of revocation. Nothing could be further from the fact. Not because such notice would not comply with the clear requirement of the guaranty that it be given in writing by registered mail but because no logical reason existed for interpreting it as a revocation. The logic of assuming that notice of the sale of their ownership interest should be understood as notice of revocation of the guaranties is that since these guarantors no longer had an interest in the Hotel, they would have no interest in further loans by the Bank. This however is a *non sequitur* because the agreement clearly showed that they continued to have a substantial financial interest in the continued viability of the business. Although they sold their ownership interest, they only received a small part of the … consideration."
*Mount Holly State Bank v. Mount Holly Washington Hotel, Inc.,* 220 N.J.Super. 506, 532 A.2d 1125, 1128 (1987).

3. Sessionses claimed that their guaranty "was only intended to cover the obligations owed by the Dickinson Energy Center partnership until the same had been paid, and which in fact were paid by the issuance of the MIDA bond." However, this assertion is contrary to the terms of the guaranty itself, which was specifically "a continuing one" that "continue[d] in effect, notwithstanding that from time to time no indebtedness from the Debtor to the Bank may exist." The guaranty expressly provided that "no notice of any indebtedness already or hereafter contracted or acquired by the Bank, or of any renewal or extension of any thereof need be given." We cannot "ignore the clear meaning of the words" of a guaranty. *First Bank of North Dakota (N.A.) Jamestown v. Scherbenske,* 375 N.W.2d 156, 160 (N.D.1985). Unless a contract is ambiguous, its interpretation is governed by the writing itself, and intent must be "ascertained from the writing alone." *See* NDCC 9–07–02 and 9–07–04.