**TROLLEY SQUARE ASSOCIATES, and TS1 Partnership, Limited Partnership, an Indiana limited partnership, Plaintiffs, Appellee, and Cross–Appellant,**

v.

**Elaine NIELSON, Mary Whitesides, and Somebody's Mother, Inc., Defendants, Appellants, and Cross–Appellees.**

No. 930445–CA.

Court of Appeals of Utah.

Nov. 17, 1994.

Rehearing Denied Dec. 30, 1994.

D. Kendall Perkins, Salt Lake City, for appellants and cross-appellees.

E. Nordell Weeks, Salt Lake City, for appellee and cross-appellant.

Before BENCH, JACKSON and WILKINS, JJ.

## OPINION

WILKINS, Judge:

Appellants Elaine Nielson (Nielson), Mary Whitesides (Whitesides), and Somebody's Mother, Inc. (SMI), appeal the trial court's

judgment awarding Trolley Square Associates (TSA) damages and attorney fees under obligations arising from a lease and month-to-month tenancy. TSA cross-appeals the trial court's decision not to award prejudgment interest. We affirm in part, and reverse and remand in part.

## BACKGROUND

SMI is a maternity and children's clothing business owned and operated by Nielson and Whitesides. TSA owns Trolley Square, a specialty mall in Salt Lake City. On September 3, 1980, SMI and TSA executed a lease agreement involving a space at Trolley Square of approximately 2500 square feet. SMI had previously occupied a smaller space at Trolley Square. The trial court found that the lease term was to be for three lease years plus any partial lease year as defined in the lease agreement. Any holdover by SMI after the lease term expired was to be as a month-to-month tenant. Nielson and Whitesides personally guaranteed the obligations of SMI under the lease.

SMI occupied the new space and experienced a growth in its business through 1982. Beginning about mid–1982, however, SMI's revenues fell off. It began to accrue a rent arrearage by the end of 1983. This arrearage grew until SMI vacated the leased premises on May 15, 1987.

While SMI was accruing this rent arrearage, Nielson and Whitesides expressed disapproval of the manner in which the shopping center conducted its management and maintenance activities. The trial court found that various negotiations occurred concerning an adjustment or abatement of rent charges, but that no agreement abating or reducing rent was ever agreed upon.

After a bench trial, judgment was awarded against SMI, and Nielson and Whitesides as guarantors, in the amount of $115,840.70 for unpaid rent and other charges, and $9,195 for attorney fees, with no prejudgment interest.[1] During the course of the trial, TSA introduced three pages, numbered as Exhibits 51, 52, and 53, which were presented as a summary of monthly statements containing the amounts due to TSA for the months of December 1983 through December 1986. The summaries reflected monthly charges for base rent, common area fee, insurance, property tax, and merchant dues. These summaries were admitted into evidence as "business records" and were used by the trial court to determine the judgment against SMI and against Whitesides and Nielson as guarantors of the full amount.

## ISSUES ON APPEAL

On appeal, appellants argue: (1) that the lease agreement was ambiguous, and thus the trial court should have construed the lease term as running for a total of three years, from December 1, 1980, until December 1, 1983; (2) that the trial court should have found that TSA's statements or actions estopped it from collecting the full rent arrearage; (3) that the trial court improperly admitted account summaries as evidence of what SMI owed TSA; and (4) that the trial court incorrectly concluded that Nielson and Whitesides are bound as guarantors for obligations incurred during the period of time that SMI occupied the premises, rather than just during the express term of the lease agreement.

## ANALYSIS

### I. Lease Term

The trial court found that TSA, SMI, Nielson, and Whitesides executed the lease agreement on September 3, 1980. The appellants contend that the lease agreement is ambiguous and should thus be construed against TSA, the drafter. Contract interpretation begins with an examination of the contract itself. The initial question of whether the lease agreement is ambiguous is a question of law, to be reviewed for correctness. *Wade v. Stangl,* 869 P.2d 9, 12 (Utah App. 1994); *Home Sav. & Loan v. Aetna Casualty & Sur. Co.,* 817 P.2d 341, 347 (Utah App. 1991). If a contract is ambiguous, it will be construed against the drafter only if extrinsic evidence fails to clarify the intent of the

---

1. The trial court also awarded SMI judgment against TSA in the amount of $62,000 for damage to inventory due to construction. This part of the judgment was not appealed.

parties. *Wilburn v. Interstate Elec.,* 748 P.2d 582, 585 (Utah App.), *cert. granted,* 765 P.2d 1277 (Utah 1988), *cert. dismissed,* 774 P.2d 1149 (Utah 1989). The findings of the trial court regarding the intent of the parties, determined by extrinsic evidence, will be overturned only if clearly erroneous. *Allstate Enter., Inc. v. Heriford,* 772 P.2d 466, 468 (Utah App.1989).

■ An examination of the lease agreement leads us to conclude that it is not ambiguous and that the trial court correctly interpreted the lease by reference to the terms of the document itself as expiring on December 31, 1984. Article I of the lease agreement, under the heading "Fundamental Lease Provisions," describes the lease term as:

> Three Years
>
> ( 3 ) consecutive full lease years, (plus a partial lease year, if any, prior to the first full lease year)

This provision refers to another section of the lease, section 3.04, which defines a "lease year" and a "partial lease year" as follows:

> The term "lease year" as used herein shall mean a period of twelve (12) consecutive full calendar months commencing on the first day of January of each year during the term hereof. The first lease year shall begin on the date of commencement of the term hereof if such date of commencement shall occur on the first day of January; if not, then the first lease year shall commence upon the first day of January next following the date of commencement of the term hereof. Each succeeding lease year shall commence upon the anniversary date of the first lease year. Any portion of the term hereof prior to commencement of the first lease year shall be deemed a "partial lease year". . . .

Arguably, the term of the lease is also described by the "Minimum Annual Rental" language under the "Fundamental Lease Provisions":

Nineteen Thousand Eight Hundred Forty* Dollars ($19,840.00) [2] per annum, payable in twelve (12) equal monthly installments during each year.

> * First 24 months
> Last 12 months—$29,760.00 [3]

A document titled "Lease Worksheet" is also part of the lease document, and lists:

> ANNUAL MIN. RENT $19,840—first 24 months
> $29,760—last 12 months

. . . .

LEASE TERM 3 Years COMMENCING Opening for Business

In addition, a rider was attached to the lease with the following two sections:

> Section 28.20. *Commencement of Lease.* This lease shall commence and be in full effect when tenant opens for business or December 1, 1980, whichever occurs first. ["December 1, 1980" is lined through, with a line drawn to a handwritten "February 15, 1981," initialed by M.W. and W.W.[4]]
>
> Section 28.21. *Partial Lease Year.* Any additional months of occupancy due to partial lease year shall be charged rent at the rate of $8.00 per square foot prior to the last 12 months of occupancy, or the calendar year 1983. [The "3" in "1983" is overwritten with a "4," initialed by M.W. and W.W.]

The trial court concluded that the lease term began February 15, 1981, and that the lease agreement expired December 31, 1984. Appellants argue that the conspicuous use of "3 years" on the lease worksheet to describe the lease term, coupled with the description of rent as $19,840 for the first twenty-four months and $29,760 for the last twelve months, listed on the lease worksheet and under the "Fundamental Lease Provisions," should compel a construction of the lease agreement in favor of the lease term running three years, and not three years and ten and one-half months. However, a careful reading of the lease agreement discloses that the

---

**2.** This figure reflects a rate of $8.00 per square foot.

**3.** This figure reflects a rate of $12.00 per square foot.

·**4.** The trial court found that "M.W." and "W.W." were the initials, respectively, of Mary Whitesides who was at the time an officer of SMI, and of Wallace Wright, then a partner of TSA.

lease term begins on February 15, 1981, and includes a ten and one-half month partial lease year before the three full lease years begin. The term of the lease ended on December 31, 1984.

On the first page of the lease agreement, under the heading "Fundamental Lease Provisions," the lease term is described as three full lease years plus a partial lease year prior to the first full lease year. A partial lease year is defined as any portion of the term before the first of January, when the first full lease year begins. According to the two sections contained in the rider to the lease agreement, the lease was to commence on February 15, 1981, with a rental rate of $8.00 per square foot until the last twelve months, or the calendar year 1984.

While the lease agreement is not a model of clarity, we find the lease term is defined sufficiently within the four corners of the document, obviating the necessity to look at extrinsic evidence of the parties' intent. The trial court found Nielson and Whitesides to be "sophisticated businesswomen who had resources and the ability to contact counsel and made an informed decision when they executed the lease." The trial court accordingly held appellants to the lease term as disclosed in the lease agreement—commencing February 15, 1981, and ending December 31, 1984. We agree.

## II. Equitable Estoppel

■ Appellants claimed at trial that TSA made representations that the rent arrearage problem would be resolved to the mutual benefit of both parties; encouraged SMI not to leave the mall; and used SMI's continued presence in the mall to TSA's benefit; therefore, TSA should be estopped from claiming the full rent arrearage. The necessary elements of an equitable estoppel claim are:

(1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Holland v. Career Serv. Review Bd.,* 856 P.2d 678, 682 (Utah App.1993). The trial court did not find facts that would estop TSA from claiming full rent.

It is unclear whether appellants are challenging the trial court's findings of fact as not supported by the evidence, or the conclusion of law based on the findings of fact. Either way, appellants do not present a compelling argument.

■ If appellants are attempting to challenge the trial court's factual findings, they have failed to marshal evidence in support of the findings and then demonstrate why the evidence is insufficient or why the contested finding is clearly against the weight of the evidence. *See Wade v. Stangl,* 869 P.2d 9, 12 (Utah App.1994). We cannot determine whether evidence is sufficient in this case when no attempt was made to marshal the supportive evidence and all the evidence presented to us by the appellants is presented only in the light most favorable to the appellants' case. *See In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989); *West Valley City v. Majestic Inv. Co.,* 818 P.2d 1311, 1313 (Utah App.1991). Accordingly, we accept the factual determinations made by the trial court.

■ The application of the facts to the legal standard of equitable estoppel is a mixed question of fact and law. Similar to the doctrine of waiver, the determination of equitable estoppel is "a highly fact-dependent question, one that we cannot profitably review de novo in every case because we cannot hope to work out a coherent statement of the law through a course of such decisions." *State v. Pena,* 869 P.2d 932, 938 (Utah 1994) (referring to the doctrine of waiver). Consistent with the Utah Supreme Court's standard of review on the issue of waiver, we grant similar broadened discretion to the trial court on the issue of equitable estoppel. *See Id.; Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935 (Utah 1993).

The trial court read the behavior of the parties as a failed attempt to resolve a dispute and reach an agreement concerning the

adjustment or abatement of rent. We assume that this overall view of the interaction between the parties led the trial court to reject appellants' argument of equitable estoppel. We find that it was within the trial court's discretion to so conclude. Accordingly, we hold that the trial court did not abuse its discretion on this issue, and affirm the trial court's determination that the doctrine of equitable estoppel does not apply in this instance.

### III. Admission of Summaries

The trial court admitted three exhibits, numbered 51, 52, and 53, into evidence as business records. The exhibits were presented as summaries of thirty-six monthly statements covering a three year period. Four of these monthly statements were introduced into evidence. These four statements reflect charges for base rent, common area fee, insurance, property tax, and merchant dues, and any payments made by SMI. The summaries are intended to catalogue the net indebtedness of SMI to TSA over a three year period based on the monthly statements. Appellants argue that the summaries should not have been admitted since they were not the originals, and did not qualify as the best evidence under Rule 1002 of the Utah Rules of Evidence. The trial court admitted the summaries as business records under Rule 803(6) of the Utah Rules of Evidence, one of the exceptions to the hearsay rule.

■ In general, trial courts are granted broad discretion in admitting or excluding evidence. *State v. Pena*, 869 P.2d 932, 938 (Utah. 1994). However, applying a specific standard of review for evidentiary rulings has proven problematic given the necessary analysis of factual issues, legal issues, and a mixture of both. *See Hansen v. Heath*, 852 P.2d 977, 978 (Utah 1993). A decision whether or not to admit evidence is often the "sum of several rulings, each of which may be reviewed under a separate standard." *State v. Thurman*, 846 P.2d 1256, 1270 n. 11 (Utah

1993). We look first to whether it was within the trial court's discretion to admit Exhibits 51, 52, and 53 as business records under Rule 803(6). We then examine the legal question of the relationship between Rule 803(6), the business records exception to hearsay, and Rule 1006, the exception to the best evidence rule involving summaries, to determine the admissibility of the summaries in this case.

■ The Utah Supreme Court, in *State v. Bertul*, 664 P.2d 1181 (Utah 1983), gave the following guidance for admitting evidence under the business record exception to hearsay:

> For evidence to be admissible as a business record, a proper foundation must be laid to establish the necessary indicia of reliability. That foundation should generally include the following: (1) the record must be made in the regular course of the business or entity which keeps the records; (2) the record must have been made at the time of, or in close proximity to, the occurrence of the act, condition or event recorded; (3) the evidence must support a conclusion that after recordation the document was kept under circumstances that would preserve its integrity; and (4) the sources of the information from which the entry was made and the circumstances of the preparation of the document were such as to indicate its trustworthiness. Generally, the requisite foundation can be made by the custodian of the records.

*Id.* at 1184.[5]

■ While broad discretion is given to the trial court to determine admissibility, that determination must be based on an adequate foundation. In the present case, the trial court heard testimony from Mr. Wright, a TSA partner, that the monthly statements summarized by Exhibits 51, 52, and 53 were kept in the ordinary course of business, but no testimony was given that the summaries themselves were either kept in the ordinary course of business or were made at the time of the condition or event recorded. To the contrary, Mr. Wright testified that the sum-

---

**5.** The court in *State v. Bertul* was giving guidance on the application of Rule 63(13) of the Utah Rules of Evidence, a precursor to Rule 803(6). The articulation of the business records exception in both rules is similar enough in substance to apply the court's guidance in *Bertul* to the present case, and we adopt the *Bertul* standard as applicable to Rule 803(6).

maries were prepared at his request sometime after 1986.

While the monthly statements upon which the summaries are based may qualify as business records under Rule 803(6), it is clear in this case that the summaries themselves do not. *See Shurtleff v. Jay Tuft & Co.*, 622 P.2d 1168 (Utah 1980). In *Shurtleff*, the court held that a summary of invoices did not qualify as a "business record" because it was "apparently prepared in anticipation of, and preparation for, this lawsuit," and "not made in the regular course of business." *Id.* at 1174. It appears that the summaries in the present case were at best prepared for the purpose of collecting a debt. Irrespective of any argument that debt collection summaries are made in the regular course of business, it is clear that these particular summaries do not qualify under Rule 803(6) because they are not records made at or near the time of the condition being recorded—the accrual of the indebtedness. Therefore, Exhibits 51, 52, and 53 do not qualify as business records under Rule 803(6).

 Summaries of business records may be admitted as evidence, however, under Rule 1006 of the Utah Rules of Evidence. Under Rule 1006, "[t]he contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a ... summary." Utah R.Evid. 1006 (1994). Whether the records are too voluminous to conveniently be examined in court is a determination to be made at the discretion of the trial judge. However, the records must be made available for examination by other parties. Utah R.Evid. 1006 (1994). The party offering the summaries has the burden of making the records available to the other parties' satisfaction. *Gull Labs., Inc. v. Louis A. Roser Co.*, 589 P.2d 756, 758–9 (Utah 1978). In this case, the original records were not produced by TSA.

Thus, the requirements of Rule 1006 were not met.

 The Utah Supreme Court has given guidance on the admissibility of summaries and the relationship between such summaries and the underlying records being summarized. In *International Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc.*, 626 P.2d 418, 422 (Utah 1981), the Court made clear that for a summary to be admissible, it must qualify under Rule 1006,[6] *and* the underlying records being summarized must qualify under the hearsay exception of Rule 803(6). *See also United States v. Johnson*, 594 F.2d 1253 (9th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979). There must be testimony that provides the necessary foundation for a business record exception for the documents being summarized, and there must be adequate foundation for the admission of the summary itself. The summaries in this case should not have been admitted as evidence of SMI's indebtedness to TSA without so qualifying under Rule 1006 and Rule 803(6).[7] By admitting Exhibits 51, 52, and 53, the trial court abused its discretion.

## IV. Personal Guarantees

The trial court found as fact that Nielson and Whitesides executed the guarantee of lease, which was attached to the lease. The trial court also found that Nielson and Whitesides executed estoppel certificates on May 15, 1983; June 4, 1983; and June 6, 1986. Additionally, the trial court found that "[SMI] occupied the premises described in the Lease with the lease term commencing February 15, 1981, and ending May 15, 1987," and that "[SMI] was occupying the premises on a month-to-month tenancy after December 31, 1984." These factual findings are accepted and unchallenged.

 We are left then with the trial court's legal conclusion based on its interpre-

---

6. The court in *International Harvester* speaks of the relationship between Rule 70(1)(f) and Rule 63(13) of the Utah Rules of Evidence as they read in 1981. These rules are sufficiently similar in substance to Rule 1006 and Rule 803(6), respectively, to apply the court's analysis to the current rules.

7. We note the following language from the Supreme Court of Wyoming: "It is a frightening prospect to think that a person could be sued for services rendered and have the plaintiff base its claim solely upon a recapitulation of computer printout sheets." *Harned v. Credit Bureau of Gillette*, 513 P.2d 650, 652 (Wyo.1973).

tation of the guarantee of lease. The trial court concluded that the legal effect of the guarantee of lease and estoppel certificates was to bind Nielson and Whitesides "as guarantors under the terms of the Lease for all the periods of time that the defendants occupied the premises." It is not contended that the guarantee of lease contract is ambiguous. Whether a trial court properly interpreted an unambiguous contract is a question of law, reviewed for correctness, with no deference granted to the trial court. *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991).

■ The issue is whether the guarantee applies to obligations incurred by SMI during its month-to-month tenancy after the lease had expired. We hold that the guarantee applies only to the obligations incurred by SMI during the term of the lease, which was February 15, 1981, through December 31, 1984.[8]

The three estoppel certificates signed by Nielson and Whitesides do nothing to alter the obligations that arise under the lease agreement and guarantee of lease. They merely acknowledge to third parties the existence of such agreements. We therefore turn to the guarantee of lease agreement itself.

We accept the general principle that "[i]n determining the nature and extent of the guarantor's liability under a guaranty of payment of rent ... the general rules of construction apply, and the contract will be strictly construed to impose only those burdens clearly within its terms." *Orange–Co., Inc. v. Brown*, 181 Ind.App. 536, 393 N.E.2d 192, 196 (1979) (quoting 38 C.J.S. *Guaranty* § 50). We must look to the guarantee of lease agreement to see what obligations are guaranteed. It provides:

> WHEREAS, the Landlord under said Lease requires as a condition to its execution of said Lease that the undersigned guarantee the full performance of the obli-

gations of the Tenant under said Lease. . . .

> NOW, THEREFORE, in consideration of the execution of said Lease by Trolley Square as Landlord, the undersigned hereby unconditionally guarantees the full performance of each and all of the terms, covenants and conditions of said Lease to be kept and performed by said Tenant, including the payment of all rentals and other charges to accrue thereunder.

It is clear from this language that what was being guaranteed was the payment of rentals and other charges which *accrued under the lease*. The question is whether the obligation to pay rent and other charges incurred by SMI during the month-to-month tenancy arose or accrued under the lease. If not, Nielson and Whitesides cannot be said to have agreed to guarantee the payment of rentals and other charges incurred by SMI after December 31, 1984.

TSA argues that the guarantee of lease represented a continuing guarantee covering the obligations incurred by SMI for an indefinite period until revoked by Nielson and Whitesides. In support, TSA points to the following language in the next paragraph of the guarantee of lease:

> [T]his covenant and agreement shall *continue* in favor of the Landlord notwithstanding any extension, modification, or alterations of said Lease entered into by and between the parties ... and no extension, modification, alteration or assignment of the above referred to Lease shall in any manner release or discharge the undersigned. . . .

(emphasis added). This language does not say that Nielson and Whitesides will continue to guarantee obligations incurred by SMI after the lease expires. Rather, it provides that the *agreement itself to guarantee the obligations under the lease will continue to be valid* in the event the lease is extended, modified, or altered, which it was not.[9]

8. It was found by the trial court and admitted by TSA that the lease, by its terms, expired on December 31, 1984, and thereafter SMI occupied the premises on a month-to-month tenancy. This is consistent with our affirmance of the trial court's interpretation of the lease agreement.

9. The guarantee agreement uses the term "continue" in the same way in the next paragraph where it says, "This Guarantee will *continue* unchanged by any bankruptcy, reorganization or insolvency of the Tenant. . . ." (emphasis added). None of these conditions are alleged to have occurred.

For an agreement to be a continuing guarantee it must "contemplate[ ] a future course of dealing for an indefinite period of time, or ... intend[ ] to cover a series of transactions." *Cessna Fin. Corp. v. Meyer*, 575 P.2d 1048, 1050 (Utah 1978). No language in the guarantee of lease agreement refers to obligations arising over a series of transactions, or for an indefinite period of time, or from any source other than the lease agreement itself.

Returning to the question of whether rental and other charges incurred by SMI under a month-to-month tenancy arose or accrued under the lease, the lease agreement did provide for a rental rate equal to the last month's rent in the event of a month-to-month holdover tenancy. However, this provision does not mean that the obligation to pay rent during a month-to-month tenancy arises under the lease. Had the lease provided for, and SMI exercised, an option to renew or extend the lease agreement itself for a term, we would reach a different result. In that case the additional obligations would be under the lease, and those obligations would therefore be contemplated by the guarantee. This principle is articulated in 38 C.J.S. *Guaranty* § 50:

> Where a lease for a specified term gives the lessee the option of holding over for an additional term, ... a guaranty of such lease covers rent accruing after the specified term, but this rule does not apply where the lease provides that if the tenant with the consent of the landlord holds over without modification of the lease or without entering into any subsequent lease he shall be considered a hold-over tenant on a month-to-month basis.

This is the precise situation we have before us.

The lease agreement did not create the obligation to pay rent under the month-to-month tenancy. Instead, the lease created an obligation to pay rent through December 31, 1984. While the lease agreement provides that any holdover after the expiration of the term, or extended term, was to be a month-to-month tenancy at the rental rate of the last month of the lease term, this did not obligate SMI to stay, nor did it obligate TSA to keep SMI as tenants. The guarantee of lease only covered the obligations under the lease, not obligations incurred after the lease expired. The obligations guaranteed under the lease ended on December 31, 1984. The liability of Nielson and Whitesides must be adjusted accordingly.

## CONCLUSION

We hold: (1) that the trial court's interpretation of the lease agreement is correct—the lease expired on December 31, 1984; (2) that it was within the trial court's discretion to find that TSA should not be equitably estopped from claiming full rent during the time SMI occupied the premises; (3) that the summaries, Exhibits 51, 52, and 53, were improperly admitted, and to be admitted must meet the requirements of Rule 1006 of the Utah Rules of Evidence *and* the underlying records must meet the requirements of Rule 803(6) of the Utah Rules of Evidence; and (4) that the guarantee of lease signed by Whitesides and Nielson covered only the obligations arising under the lease, which ended on December 31, 1984, and does not extend to obligations incurred by SMI during the month-to-month tenancy. We reverse in part and remand to the trial court for a determination of such damages, if any, as may be due TSA based upon evidence other than Exhibits 51, 52, and 53; for a determination of what prejudgment interest, if any, TSA may be entitled to on such damage; and for revision of the judgment against Nielson and Whitesides under their guarantee to include only damages established as arising under the lease, during the period February 15, 1981, through December 31, 1984. The parties shall bear their own costs associated with this appeal.

BENCH and JACKSON, JJ., concur.