OPINION
ORME, Judge:
T1 Robert Oltmanns and Brady Blackner appeal the decision of the district court granting Fire Insurance Exchange's motion for summary judgment. The court determined that the term "jet ski" as used in a homeowner's policy was unambiguous and effectively excluded coverage for claims aris *804 ing from the use of any and all personal watercraft. We reverse.
BACKGROUND
T2 Oltmanns, the insured, and his friend Blackner were operating a Honda F-12 AquaTrax personal watercraft on a lake in southern Utah. This kind of personal watercraft is designed for use by a seated driver and up to two additional seated passengers. A lawsuit resulted from injuries sustained in an accident that occurred during this use, and Oltmanns tendered the defense to Fire Insurance Exchange, with whom he was insured under a homeowner's policy. The insurance policy contained the following exclusion from its liability coverage:
We do not cover bodily injury [that] ...
[[Image here]]
7. results from the ownership, maintenance, use, loading or unloading of:
a. aircraft
b. motor vehicles
c. jet skis and jet sleds or
d. any other watercraft owned or rented to an insured and which:
(1) has more than 50 horsepower inboard or inboard-outdrive motor power;
or
(2) is powered by one or more outboard motors with more than 25 total horsepower; or
(3) is a sailing vessel 26 feet or more in length.
Exclusions 7e and d do not apply while jet skis, jet sleds or watercraft are stored....
1 3 Relying on this exclusion, the insurance company brought a declaratory judgment action against Oltmanns and Blackner, arguing that it had no duty to defend or indemnify Oltmanns or compensate Blackner because liability coverage was excluded by the above provision. The insurance company then moved for summary judgment, arguing that Oltmanns was operating a "jet ski," which is merely a synonym for personal watercraft, and that the policy unambiguously excluded coverage for use of all such watercraft. Olt-manns argued that the exclusion did not apply because it was ambiguous, pointing out that "Jet Ski" is a registered trademark for a particular model of Kawasaki personal watercraft, which was not involved in the accident. The trial court granted the insurance company's motion for summary judgment, and this appeal followed.
ISSUE AND STANDARD OF REVIEW
T4 Oltmanns and Blackner contend that the trial court erred in granting the insurance company's motion for summary judgment. A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Where the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law." Orvis v. Johnson, 2008 UT 2, ¶ 10, 177 P.3d 600. Even "'[wlhere the party opposed to the motion submits no documents in opposition, the moving party may be granted summary judgment only ... if he is entitled to judgment as a matter of law'" Ward v. Graydon, 2011 UT App 358, ¶ 15, 264 P.3d 764 (emphasis and omissions in original) (quoting Olwell v. Clark, 658 P.2d 585, 586 (Utah 1982)), cert. denied, 275 P.3d 1019 (Utah 2012). A trial court's ruling on summary judgment presents a question of law. See Massey v. Griffiths, 2007 UT 10, ¶ 8, 152 P.3d 312. The court's "legal conclusions and ultimate grant or denial of summary judgment are reviewed for correctness." Id. Also, "interpretation of an insurance contract presents a question of law" and we "accord the trial court's legal conclusions regarding the contract no deference but review them for correctness." Bear River Mut. Ins. Co. v. Williams, 2006 UT App 500, ¶ 7, 153 P.3d 798 (citations and internal quotation marks omitted).
ANALYSIS
T5 The insurance company argues that its use of the term "jet ski" was intended to refer to any and all personal watercraft. It contends that "jet ski" is common vernacular for such and thus is not ambiguous. Before we attempt to understand what *805 "jet ski" means for purposes of this contract, however, it is helpful to review the rules governing contract interpretation, particularly in the insurance contract context.
16 "Insurance policies are generally interpreted according to rules of contract interpretation." Utah Farm Bureau Ins. Co. v. Crook, 1999 UT 47, ¶ 5, 980 P.2d 685. Because "an insurance policy is a classic example of an adhesion contract," Utah courts have long held that " insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance.'" United States Fidelity & Guar. Co. v. Sandt, 854 P.2d 519, 521-22 (Utah 1993) (quoting Richards v. Standard Acc. Ins. Co., 58 Utah 622, 200 P. 1017, 1020 (1921)). "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage" and "provisions that limit or exelude coverage should be strictly construed against the insurer." Id. at 522-28. In strictly construing exclusions, we give them effect only when they use "language which clearly and unmistakably communicates to the insured the specific cireumstances under which the expected coverage will not be provided." Crook, 1999 UT 47, ¶ 5, 980 P.2d 685 (citations and internal quotation marks omitted).
17 When faced with ambiguity in a written contract, courts do not interpret the provision to comport with what they think is most sensible or is most likely what one of the parties "really" meant or is what leads to the fairest result, Rather, they recognize the need to consider extrinsic evidence in an effort to resolve the ambiguity. See Wilburn v. Interstate Electric, 748 P.2d 582, 584-85 (Utah Ct.App.1988). If the extrinsic evidence is not conclusive, then the last resort in contract interpretation is to construe the provision against the drafter. See id. at 585 ("Onee a contract is deemed ambiguous, the next order of business is to admit extrinsic evidence to aid in interpretation of the contract. It is only after extrinsic evidence is considered and the court is still uncertain as to the intention of the parties that ambiguities should be construed against the drafter.") (footnote omitted).
18 As a practical matter, though, there is a different protocol in the case of insurance and surety contracts, where it is seen as appropriate to jump immediately to what is usually viewed as the "last resort," "tie-breaker" rule of interpretation, namely construction against the drafter. See id. at 585 & n. 2. This is due to the probable dearth of relevant extrinsic evidence in these contexts. See id. (noting that while the usual rule is that extrinsic evidence must be considered before turning to the rule of construction that calls for ambiguities to be construed against the drafter, there are "arguable exceptions" in the case of insurance and surety contracts that "may be explained, at least in part, by the fact that such contracts are ordinarily not preceded by discussion or negotiation of specific terms and, thus, absent meaningful extrinsic evidence as to intent, recourse must be had directly to the maxim that ambiguities should be construed against the drafter"). As noted above, construction against the insurer is especially appropriate when an ambiguous term appears in an exclusionary provision because such provisions are "strictly construed against the insurer." Sandt, 854 P.2d at 528.
T 9 In the case at hand, it may be true that the insurer meant, through its use of the term "jet ski," to exclude from coverage all varieties of personal watercraft. And we are confident that the insurer did not intend to refer only to a particular Kawasaki model of personal watercraft, even though there is such a model named Jet Ski. But the provision in question is not a model of clarity and at least one additional interpretation is entirely possible. Another common use of the term "jet ski" is in reference to the stand-up variant of personal watercraft, in contradistinction to the sit-down variety, known colloquially-and also imprecisely-as wave runners. The subject is well-illuminated in that great repository of contemporary wisdom, Wikipedia: [1]
*806 Jet Ski is the brand name of a personal watercraft manufactured by Kawasaki Heavy Industries. The name is sometimes mistakenly used by those unfamiliar with the personal watercraft industry to refer to any type of personal watercraft; however, the name is a valid trademark registered with the United States Patent and Trademark Office, and in many other countries. The term "Jet Ski" (or JetSki, often shortened to "Ski") is often misapplied to all personal watercraft with pivoting handlepoles manipulated by a standing rider; these are properly known as Stand-up PWCs. The term is often mistakenly used when referring to WaveRunners, but WaveRunner is actually the name of the Yamaha line of sit-down PWCs, whereas "Jet Ski" refers to the Kawasaki line.
Jet Ski, http://en.wikipedia.org/wiki/Jet_ski {last visited August 13, 2012) (footnotes omitted). -
{ 10 Basically, then, the insurer was imprecise in using the term "jet ski" in its policy. Even discounting the bizarre possibility that it meant to refer only to one Kawasaki watercraft model, it still cannot be definitively said what the insurer intended: Did it mean all manner of personal watercraft? Or did it mean only the stand-up variety?[2] The provision, then, is ambiguous as a matter of law.[3]
CONCLUSION
T11 This provision fails to "clearly and unmistakably communicate[ ] to the insured the specific cireumstances under which the expected coverage will not be provided." Utah Farm Bureau Ins. Co. v. Crook, 1999 UT 47, ¶ 5, 980 P.2d 685 (citation and internal quotation marks omitted). Because the exclusionary provision is ambiguous, it must be construed against the drafter, and thus the language relied on by the insurance company is not effective to exclude coverage for an insured's accident resulting from use of an AquaTrax personal watercraft of the sit-down variety. The summary judgment is reversed and the case remanded for trial or such other proceedings as may now be in order.
{12 I CONCUR: CAROLYN B. McHUGH, Presiding Judge.

. In the past, we might have hesitated to cite Wikipedia in a judicial opinion given its reputation-perhaps not well deserved-for unreliability. See, eg., Wikipedia Survives Research Test, *806 BBC News (Dec. 15, 2005), http://news.bbc.co. uk/2/hi/technology/4530930.stm (finding rate of error in scientific articles to be about the same as between Wikipedia and Encyclopedia Britannica). But the increasing trend of using Wikipedia in judicial opinions over the last decade seems to demonstrate a growing recognition of its value in some contexts, as noted in one 2010 article that found that by that year Wikipedia had been cited in over four hundred judicial opinions. See Lee F. Peoples, The Citation of Wikipedia in Judicial Opinions, 12 Yale J. L. & Tech. 1, 1 (2009-2010) (reviewing several instances in which Wikipedia has been cited in judicial opinions and critiquing its usefulness, or lack thereof, in those contexts). Judge Posner argued in 2007 that "Wikipedia is a terrific resource ... [plartly because it [is] so convenient, it often has been updated recently and [it] is very accurate," after citing it in United States v. Radomski, 473 F.3d 728, 731 (7th Cir.2007). See Noam Cohen, Courts Turn to Wikipedia, but Selectively, N.Y. Times, Jan. 29, 2007 at C3. While a prudent person would avoid a surgeon who bases his or her understanding of complicated medical procedures on an online source whose contributors range from expert scholars to internet trolls, where an understanding of the vernacular or colloquial is key to the resolution of a case, Judge Posner is correct that Wikipedia is tough to beat. A fuller explanation of the propriety of citing Wikipedia is set forth in Judge Voros's separate opinion.

. This does not seem like a terribly far-fetched proposition. Intuitively, at least, it seems that a motorized watercraft on which the rider stands up may be much more dangerous than one on which the rider is seated.

. The insurer's lack of care in drafting this provision is further demonstrated by its pairing of the term "jet sled" with "jet ski." The author of this opinion theorized at oral argument that perhaps "jet sled" was used in reference to the sit-down variants of personal watercraft while "jet ski" was used to refer to the stand-up kind. The idea had no takers, however, despite its apparent logic, and indeed, our research finds not a single instance where "jet sled" has been used synonymously with personal watercraft of any sort. Wikipedia does not even have an article, among its several million, on jet sleds. It appears that "jet sled" can refer to an unmotorized sled used for hauling ice fishing equipment, see Shappell, Multi-Purpose Sleds, http:/www.shappell.com/ sleds.html (last visited August 8, 2012), or to a large motorboat of the sort that would be readily and redundantly covered in the next subsection, subsection (d), of the exclusion in question, see Google Images for "Jet Sled Boat," http://google. com (follow "Images" option; then search "Jet Sled Boat") (last searched August 8, 2012).