# IN THE SUPREME COURT OF TEXAS

No. 15-0790

D MAGAZINE PARTNERS, L.P. D/B/A D MAGAZINE, MAGAZINE LIMITED
PARTNERS, L.P., AND ALLISON MEDIA, INC., PETITIONERS,

v.

JANAY BENDER ROSENTHAL, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued October 4, 2016**

JUSTICE LEHRMANN delivered the opinion of the Court.

JUSTICE GUZMAN filed a concurring opinion.

A free press is essential to a healthy democracy. Through conscientious and diligent reporting, the press holds public officials accountable and helps citizens stay informed on matters of public concern. Accordingly, both the U.S. Constitution and the Texas Constitution robustly protect freedom of speech. But, these safeguards are not unlimited and do not categorically deprive individuals of legal recourse when they are injured by false and defamatory speech. The line between the rights of the press and the rights of defamed individuals is not easily drawn. This elusive boundary underlies today's dispute about the propriety of a defamation lawsuit's early dismissal under the Texas Citizens Participation Act (TCPA).

In this case, the plaintiff—a private citizen who was the subject of a magazine article about her receipt of food stamps—sued the magazine, asserting defamation and other claims stemming from allegations that the article falsely accused her of committing welfare fraud. When the magazine moved to dismiss the suit under the TCPA, the trial court denied the motion as to the defamation claim, granted it as to the other claims asserted, and denied the magazine's request for attorney's fees. The court of appeals affirmed, holding that the plaintiff was entitled to proceed on her defamation claim. The court also concluded that it lacked jurisdiction over the appeal of the trial court's denial of attorney's fees.

The magazine presents two primary issues here. First, it asserts that the court of appeals improperly relied on Wikipedia as authority in its opinion. Second, it argues that the plaintiff failed to establish a prima facie case of defamation sufficient to defeat the magazine's dismissal motion. We agree with the magazine that the court of appeals' reliance on Wikipedia led to an unduly narrow interpretation of the article's title that, in turn, impacted the court's analysis of the plaintiff's defamation claim. As to the second point, we hold that a reasonable person could construe the article as a whole to accuse the plaintiff of fraudulently obtaining public benefits and that the plaintiff presented sufficient evidence in support of the defamation elements to survive the magazine's motion for early dismissal. Finally, on the ancillary issue of attorney's fees, we disagree with the court of appeals' conclusion that it lacked jurisdiction to consider the magazine's appeal of the trial court's denial of its request for attorney's fees in connection with the partially granted motion to dismiss, and we conclude that the trial court erred in awarding no fees. We affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the trial court for further proceedings.

# I. Background

In March 2013, D Magazine published an article under the heading "CRIME" titled "THE PARK CITIES WELFARE QUEEN." In the subheading, the article identifies Janay Rosenthal as a "University Park mom" who "has figured out how to get food stamps while living in the lap of luxury." Rosenthal's mug shot from a prior, unrelated arrest features prominently next to the title. The body of the article, discussed in more detail below, goes on to describe how Rosenthal "pulls it off" despite the assumption that someone in her situation would "never qualify." D Magazine printed the article, attributed to an "ANONYMOUS PARK CITIES PARENT," and also published it online.

The Texas Health and Human Services Commission is responsible for administering food stamps, now called Supplemental Nutrition Assistance Program (SNAP) benefits, in Texas. Before publication, no one from D Magazine contacted the Commission for comment. After preparing the article for print, editor-at-large Tim Rogers called Rosenthal to ask for her comments. Rosenthal told Rogers she was being harassed by her fiancé's ex-girlfriend and expressed concern that Rogers was working with her alleged harasser. Rogers suggested that she call D Magazine from its public listing to verify his identity, but she did not follow up.

After publication, the Commission's chief counsel sent Rogers a letter about the article, which counsel described as having alleged that Rosenthal "committed fraud in applying for and receiving SNAP benefits." The letter stated that the Commission had "audio recordings that indicate that the information [in the article] was obtained by deception," and the letter requested that all of Rosenthal's personally identifiable information be removed from the online version.

After reading the article, Rosenthal contacted the Commission to inquire whether she had committed any wrongdoing in obtaining SNAP benefits. The Commission investigated and sent Rosenthal a letter explaining that its "investigation found no evidence anyone has fraudulently obtained or otherwise abused state benefits." Rosenthal forwarded the letter to D Magazine.

Rosenthal sued D Magazine[1] for defamation and also asserted claims under the Texas Deceptive Trade Practices–Consumer Protection Act and the Identity Theft Enforcement and Protection Act. D Magazine moved for dismissal of all claims and sought attorney's fees under the Texas Citizens Participation Act. The trial court granted the motion as to the statutory claims but denied it "in all other respects as the Court finds that Plaintiff has established by clear and specific evidence a *prima facie* case of defamation." D Magazine brought an interlocutory appeal. TEX. CIV. PRAC. & REM. CODE § 54.014(a)(12) (authorizing an interlocutory appeal from an order denying a TCPA motion to dismiss).

A divided court of appeals affirmed, holding that Rosenthal established a prima facie case for each element of the defamation claim by clear and specific evidence. 475 S.W.3d 470, 487 (Tex. App.—Dallas 2015). The court determined that the "gist of the article included the assertion that [Rosenthal] had committed welfare fraud" by "submitting false information to [the Commission] to continue to receive SNAP benefits to which she otherwise would not have been entitled." *Id.* at 483. As part of its analysis, the court relied on a Wikipedia-supplied definition of "welfare queen" to determine the meaning of the term contained in the article's title. *Id.* at 482 n.8. Having concluded the article accused Rosenthal of committing welfare fraud, the court of

---

[1] The named defendants are D Magazine Partners, L.P. d/b/a D Magazine, Magazine Limited Partners, L.P., and Allison Media, Inc. Over the course of this litigation, the parties and courts have referred to these defendants collectively as D Magazine. We will do the same.

appeals—relying on the Commission's investigation—determined that there was evidence the article's gist was untrue and defamatory. *Id.* at 483–84. We granted D Magazine's petition for review.[2]

## II. Free Speech and the TCPA

### A. TCPA Framework

One of the foundational principles of American democracy is the freedom to comment on matters of public concern. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("The right to think is the beginning of freedom, and speech must be protected . . . because speech is the beginning of thought."). Federal constitutional protections for speech were "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). The Texas Constitution also explicitly protects freedom of expression, declaring that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject . . . and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8. Protections for the press are especially vital because of the pivotal role it plays in the dissemination of information to the public. *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("In the First Amendment, the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy.").

However, while freedom of the press is critically important to the functioning of our democratic society, members of the press are also "responsible for the abuse of that privilege."

---

[2] We have jurisdiction over interlocutory appeals "in which the justices of the courts of appeals disagree on a question of law material to the decision." TEX. GOV'T CODE § 22.225(c).

5

TEX. CONST. art. I, § 8. In turn, states maintain a legitimate interest in "the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974); *see also Kinney v. Barnes*, 443 S.W.3d 87, 91 (Tex. 2014) (noting that courts have long recognized "a cause of action for damages to a person's reputation inflicted by the publication of false and defamatory statements").

The tension between the "need for a vigorous and uninhibited press" and "the legitimate interest in redressing wrongful injury" necessarily comes into play in cases addressing First Amendment limitations on defamation liability. *Gertz*, 418 U.S. at 342. And in today's world, we must be especially mindful of this longstanding yet delicate balance, as modern technology allows information to be easily and widely disseminated without necessarily being subjected to the sort of rigorous verification processes that conventional media sources are expected to employ. Maintaining that balance of allowing the press the freedom to perform its critical societal function while protecting the rights of individuals harmed by false or misleading reporting remains an essential task, and courts continue to struggle "to define the proper accommodation between these competing concerns." *Id.*

The TCPA is also designed to balance these policies. On the one hand, the statute shields "citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015). On the other hand, the statute "protect[s] the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002. Under the TCPA, a defendant may file a motion to dismiss a legal action that "is based on, relates to, or is in response to a party's exercise of the right of free speech." *Id.* § 27.003(a). To avoid dismissal, the plaintiff must establish a prima facie case

6

for each element of the asserted claims by clear and specific evidence. *Id.* § 27.005(c). Clear and specific evidence means that the plaintiff "must provide enough detail to show the factual basis for its claim." *Lipksy*, 460 S.W.3d at 591. If the plaintiff satisfies this burden, the defendant may still obtain dismissal by "establish[ing] by a preponderance of the evidence each essential element of a valid defense" to the claim. TEX. CIV. PRAC. & REM. CODE § 27.005(d). When considering the motion to dismiss, the court considers both the pleadings and any supporting and opposing affidavits. *Id.* § 27.006(a).

### B. Defamation Framework

In this case, the parties do not dispute that the TCPA applies to Rosenthal's defamation claim and that she had the burden to establish a prima facie case of each element of defamation to avoid dismissal of the claim. These elements include: (1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se). *Lipsky*, 460 S.W.3d at 593; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Because of the importance of cultivating and protecting freedom of expression, the plaintiff bears the burden of proving falsity if the alleged defamatory statements were made by a media defendant over a matter of public concern. *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 713–14 (Tex. 2016); *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013).

In making the initial determination of whether a publication is capable of a defamatory meaning, we examine its "gist." *Neely*, 418 S.W.3d at 63. That is, we construe the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary

intelligence would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *see also Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) ("It is well settled that 'the meaning of a publication and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.'" (quoting *Turner*, 38 S.W.3d at 115)). Consistent with this approach, under the "substantial truth doctrine" a publication's truth or falsity depends on whether the publication "taken as a whole is more damaging to the plaintiff's reputation than a truthful [publication] would have been." *KBMT Operating Co.*, 492 S.W.3d at 714 (quoting *Neely*, 418 S.W.3d at 63).

In *Neely*, we reaffirmed the importance of assessing a publication's gist in evaluating a defamation claim. 418 S.W.3d at 63–64. We explained that a publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." *Id.* (citing *Turner*, 38 S.W.3d at 115). Conversely, even if all the publication's individual statements are literally true, the story "can convey a false or defamatory meaning by omitting or juxtaposing facts." *Id.* (quoting *Turner*, 38 S.W.3d at 114).

### III. Analysis of Defamation Elements

### A. The Article's Gist

The primary dispute between D Magazine and Rosenthal is over the gist of the article. D Magazine contends the article is about the Commission's decision to give SNAP benefits to a person living in an expensive home in a wealthy school district despite a criminal history of theft. Rosenthal disputes this characterization and argues the article's gist is that she defrauded the Commission to obtain benefits.

8

As noted, the court of appeals agreed with Rosenthal that the article accuses her of committing welfare fraud. In reaching its conclusion, the court of appeals cited Wikipedia to define one of the terms in the article's title, and this definition played an important role in the court's gist analysis. Because that analysis is crucial to this case, we first examine the propriety of the court's reliance on Wikipedia as authority in its opinion.

## 1. Wikipedia

The court of appeals began its gist analysis with a discussion of the article's title, "THE PARK CITIES WELFARE QUEEN." 475 S.W.3d at 482. Citing Wikipedia, along with additional sources cited in the Wikipedia article, the court stated:

> The term "Welfare Queen" has two meanings; it can mean either (1) a woman who has defrauded the welfare system by using false information to obtain benefits to which she is not legally entitled, and it can also mean (2) a woman who has exploited the welfare system by having children out of wedlock and avoiding marital relationships for the purpose of continuing to qualify legally for government benefits.

*Id.* The court explained that the second definition does not apply to Rosenthal and that the article's title therefore necessarily references a woman "who is committing fraud to receive government-assistance benefits illegally." *Id.* at 483. D Magazine and several amici[3] challenge the court's reliance on Wikipedia, contending that Wikipedia is an inappropriate source for judicial opinions.

Wikipedia is a self-described "online open-content collaborative encyclopedia." *Wikipedia: General Disclaimer*, https://en.wikipedia.org/wiki/Wikipedia:General_disclaimer (last visited Mar. 13, 2017). This means that, except in certain cases to prevent disruption or vandalism, anyone can write and make changes to Wikipedia pages. *Wikipedia: About*,

---

[3] The Texas Press Association, Texas Association of Broadcasters, Reporters Committee for Freedom of the Press, and Freedom of Information Foundation of Texas submitted an amicus brief in support of D Magazine's petition for review.

https://en.wikipedia.org/wiki/Wikipedia:About (last visited Mar. 13, 2017).  Volunteer editors can submit content as registered members or anonymously.  *Id.*  Each time an editor modifies content, the editor's identity or IP address and a summary of the modification, including a time stamp, become available on the article's "history" tab.  Jason C. Miller & Hannah B. Murray, *Wikipedia in Court: When and How Citing Wikipedia and Other Consensus Websites Is Appropriate*, 84 ST. JOHN'S L. REV. 633, 637 (2010).  Wikipedia is one of the largest reference websites in the world, with over "70,000 active contributors working on more than 41,000,000 articles in 294 languages." *Wikipedia: About*, *supra*.

References to Wikipedia in judicial opinions began in 2004 and have increased each year, although such references are still included in only a small percentage of opinions.  Jodi L. Wilson, *Proceed with Extreme Caution: Citation to Wikipedia in Light of Contributor Demographics and Content Policies*, 16 VAND. J. ENT. & TECH. L. 857, 868 (2014).  These cites often relate to nondispositive matters or are included in string citations.  But, some courts "have taken judicial notice of Wikipedia content, based their reasoning on Wikipedia entries, and decided dispositive motions on the basis of Wikipedia content."  Lee F. Peoples, *The Citation of Wikipedia in Judicial Opinions*, 12 YALE J. L. & TECH. 1, 3 (2009–2010).  While there has been extensive research on Wikipedia's accuracy, "the results are mixed—some studies show it is just as good as the experts, [while] others show Wikipedia is not accurate at all."  Michael Blanding, *Wikipedia or Encyclopædia Britannica: Which Has More Bias?*, FORBES (Jan. 20, 2015), http://www.forbes.com/sites/hbsworkingknowledge/2015/01/20/wikipedia-or-encyclopaedia-britannica-which-has-more-bias/#5c254ac51ccf.

10

Any court reliance on Wikipedia may understandably raise concerns because of "the impermanence of Wikipedia content, which can be edited by anyone at any time, and the dubious quality of the information found on Wikipedia."[4] Peoples, *supra* at 3. Cass Sunstein, legal scholar and professor at Harvard Law School, also warns that judges' use of Wikipedia "might introduce opportunistic editing." Noam Cohen, *Courts Turn to Wikipedia, but Selectively*, N.Y. TIMES (Jan. 29, 2007), http://www.nytimes.com/2007/01/29/technology/ 29wikipedia.html. The Fifth Circuit has similarly warned against using Wikipedia in judicial opinions, agreeing "with those courts that have found Wikipedia to be an unreliable source of information" and advising "against any improper reliance on it or similarly unreliable internet sources in the future." *Bing Shun Li v. Holder*, 400 F. App'x 854, 857 (5th Cir. 2010); *accord Badasa v. Mukasey*, 540 F.3d 909, 910–11 (8th Cir. 2008).

For others in the legal community, however, Wikipedia is a valuable resource. Judge Richard Posner has said that "Wikipedia is a terrific resource . . . because it [is] so convenient, it often has been updated recently and is very accurate." Cohen, *supra*. However, Judge Posner also noted that it "wouldn't be right to use it in a critical issue." *Id.* Other scholars agree that Wikipedia is most appropriate for "soft facts," when courts want to provide context to help make their opinions more readable. *Id.* Moreover, because Wikipedia is constantly updated, some argue that it can be "a good source for definitions of new slang terms, for popular culture references, and for jargon and lingo including computer and technology terms." Peoples, *supra* at 31. They also

---

[4] The history tab on each page does time stamp changes in entries and keeps past versions available. This is only useful, however, if those citing Wikipedia include in their citation the exact date and time they accessed the page. The Harvard Journal of Law and Technology has introduced a citation form for Wikipedia that includes the specific time the page was accessed. Wagner, *supra* at 235.

argue that open-source tools like Wikipedia may be useful when courts are trying to determine public perception or community norms. *Id.* at 32. This usefulness is lessened, however, by the recognition that Wikipedia contributors do not necessarily represent a cross-section of society, as research has shown that they are overwhelmingly male, under forty years old, and living outside of the United States. Wilson, *supra* at 885–89.

Given the arguments both for and against reliance on Wikipedia, as well as the variety of ways in which the source may be utilized, a bright-line rule is untenable. Of the many concerns expressed about Wikipedia use, lack of reliability is paramount and may often preclude its use as a source of authority in opinions. At the least, we find it unlikely Wikipedia could suffice as the sole source of authority on an issue of any significance to a case. That said, Wikipedia can often be useful as a starting point for research purposes. *See* Peoples, *supra* at 28 ("Selectively using Wikipedia for . . . minor points in an opinion is an economical use of judges' and law clerks' time."). In this case, for example, the cited Wikipedia page itself cited past newspaper and magazine articles that had used the term "welfare queen" in various contexts and could help shed light on how a reasonable person could construe the term.

However, the court of appeals utilized Wikipedia as its primary source to ascribe a specific, narrow definition to a single term that the court found significantly influenced the article's gist. Essentially, the court used the Wikipedia definition as the lynchpin of its analysis on a critical issue. As a result, the court narrowly read the term "welfare queen" to necessarily implicate fraudulent or illegal conduct, while other sources connote a broader common meaning. *See, e.g.*, Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/welfare_queen (last visited Mar. 13, 2017) (broadly defining "welfare queen" as a "woman perceived to be living in

luxury on benefits obtained by exploiting or defrauding the welfare system"); YourDictionary, http://www.yourdictionary.com/welfare-queen (last visited Mar. 13, 2017) (broadly defining "welfare queen" as a "woman collecting welfare, seen as doing so out of laziness, rather than genuine need"). In addition, and independent of the Wikipedia concerns, the court of appeals' overwhelming emphasis on a single term in determining the article's gist departed from our jurisprudential mandate to evaluate the publication as a whole rather than focus on individual statements.

Our own analysis of the article's gist is governed by this important principle. Accordingly, we will consider the article as a whole in order to determine whether a reasonable person could view it as accusing Rosenthal of defrauding the Commission to obtain SNAP benefits.

**2. Gist Analysis**

We begin our gist analysis with a discussion of the article's contents. As noted, the article is published under the heading "CRIME" and is accompanied by Rosenthal's mug shot from a prior unrelated charge.[5] The article states under the aforementioned "Welfare Queen" title that Rosenthal, described as a "University Park mom," has "figured out how to get food stamps while living in the lap of luxury." It then invites the reader to see how Rosenthal "pulls it off" despite the assumption that one living in the affluent Park Cities would "never qualify."

For example, the article states that Rosenthal had to "prove she qualified" for SNAP in order to obtain benefits and that, although "we can't say for sure" what Rosenthal told the Commission, "public records indicate that [she] must have been less than forthcoming" in

---

[5] The "CRIME" heading also appears on the magazine's cover, which lists the titles of the various articles within that issue and places the heading over the title of the article about Rosenthal.

13

renewing her application. The article notes that Rosenthal's address on file with the Commission matches an "old address" in North Dallas that is listed on her driver's license. It also states that Rosenthal listed this same address on an affidavit of indigency she filed in district court, notes that "[f]alsifying such a document is a felony," and identifies another court document in which Rosenthal averred "under oath" that her address had changed to one in University Park "on the tax rolls for $1.15 million." Noting that the University Park home was owned by a man Rosenthal had identified as her fiancé and that a Facebook photo showed Rosenthal wearing a diamond ring, the article also states that Rosenthal left blank the part of the application requiring applicants to identify people who give them gifts or pay their bills. The final portion of the article notes that Rosenthal has "numerous theft-related arrests and convictions" and concludes that "even if Rosenthal did report her run-ins with the law, the state still might award benefits" because the Commission "only check[s] for felony drug convictions."

The article never expressly accuses Rosenthal of lying or fraudulently obtaining benefits, and D Magazine insists that each statement in the article is literally, or at least substantially, true.[6] But the article's gist is based on "a reasonable person's perception of the entirety of [the article] and not merely on individual statements." *Turner*, 38 S.W.3d at 115. Viewing the article as a whole, we conclude that a reasonable person could perceive it as accusing Rosenthal of providing false information to the Commission (either affirmatively or by omission) in order to obtain benefits to which she was not entitled. The entire article is under the stark heading "CRIME" and is accompanied by an unrelated mug shot. It affirmatively states that Rosenthal "must have been

---

[6] Rosenthal disputes the article's statement that she has been convicted of theft, noting that she has pleaded no-contest to shoplifting charges but has never been convicted.

14

less than forthcoming," at least in renewing her SNAP application, and follows that statement with examples throughout the article of instances in which Rosenthal, at least by implication, either withheld information from or reported it inaccurately to the Commission. In sum, a reasonable person could construe the article to accuse Rosenthal of fraudulently obtaining thousands of dollars of SNAP benefits.

D Magazine's arguments to the contrary are unavailing. For example, D Magazine asserts that the "CRIME" heading is consistent with the article's criticism of SNAP, contending that the article is about how someone with a history of theft, like Rosenthal, is nevertheless able to obtain SNAP benefits. While Rosenthal's history of theft is discussed at the end of the article, it is not the focus. And it does not convince us that D Magazine's construction of the article as a whole is the only reasonable one. *See Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987) (noting that the initial question of law to be decided in a libel action is whether "the words used [were] reasonably capable of a defamatory meaning"). To the contrary, a reasonable person could certainly conclude that an article under the heading "CRIME" is in fact about the commission of a crime. And, as discussed above, that conclusion would be supported by the article's contents.

D Magazine also contends that the article's statement that Rosenthal "must have been less than forthcoming" is at most speculation, noting the prefatory disclaimer that "we can't say for sure what she told the [Commission]." We disagree. First, the article does not say Rosenthal "may" have been less than forthcoming; it says "must." This language indicates that she *did* withhold required information from the Commission and, in any event, the statement cannot be considered in a vacuum. Moreover, the article goes on to discuss specific information in the

15

Commission's records and to cite other sources that purportedly contradict that information. Considered in context, the disclaimer carries little weight.

Further, the article juxtaposes statements in ways that strongly imply wrongdoing. For example, it states that Rosenthal supplied a North Dallas address in an affidavit of indigency—the same address listed in the Commission's records—and then parenthetically states that "[f]alsifying such a document is a felony." And immediately after noting that Rosenthal did not report any gifts or money received from others, the article states that she has "relationships" to nine other households that are in a living trust for her daughter, implying the existence of significant assets not reported to the Commission. But Rosenthal presented evidence in response to the dismissal motion that the "households" the article mentions are vacant lots—none worth more than $9,000— that her brother put in a living trust in her daughter's name without her knowledge. Rosenthal also presented evidence that neither she nor her daughter ever received any payments from the trust. Again, while not expressly accusing Rosenthal of lying, these juxtaposed statements are consistent with the general implication that Rosenthal was "less than forthcoming" with the Commission in order to obtain benefits.

To arrive at its version of the article's gist, D Magazine does the very thing of which it accuses the court of appeals: it considers the article's statements individually instead of in context. Properly evaluating the article "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it," *Neely*, 418 S.W.3d at 80, we hold that a reasonable view of the article's gist is that Rosenthal fraudulently obtained SNAP benefits.[7]

---

[7] The court of appeals held that the article's gist was "a combination of" the parties' descriptions, holding that a "reasonable person would conclude the article was a criticism of SNAP, which allowed [Rosenthal], who had been convicted of theft, to receive benefits while living in a $1.15 million home and while defrauding [the

16

## B. Prima Facie Case of Defamation

As noted, to survive D Magazine's motion to dismiss, Rosenthal had to establish a prima facie case of each of the following elements of her defamation claim: (1) D Magazine published a false statement; (2) the statement defamed her; (3) D Magazine acted with negligence regarding the truth of the statement; and (4) she suffered damages or the article is defamatory per se. *See Lipsky*, 460 S.W.3d at 593. The article's gist informs our analysis and is dispositive of the second and fourth elements. Because the article could reasonably be construed to accuse Rosenthal of committing a crime, it is defamatory per se, and Rosenthal need not show actual damages. *See Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013) ("Historically, defamation *per se* has involved statements that are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish."); *see also Lipsky*, 460 S.W.3d at 596 (citing accusing someone of committing a crime as an example of defamation per se). Rosenthal also presented clear and specific evidence that the article's gist is not substantially true; specifically, she presented evidence that the Commission conducted an investigation and concluded that she engaged in no wrongdoing in obtaining SNAP benefits.

The final disputed element of the claim is whether D Magazine acted with the requisite degree of fault. In Texas, courts apply a negligence standard in cases involving a private plaintiff seeking defamation damages from a media defendant. *Neely*, 418 S.W.3d at 61. Under that standard, the defendant is negligent if it "knew or should have known a defamatory statement was

---

Commission] by filing false information with [the Commission]." 475 S.W.3d at 482. D Magazine argues that the court of appeals' version of the gist is internally inconsistent: either the Commission knowingly allowed Rosenthal to receive SNAP benefits while living in an expensive home and despite a history of theft, or Rosenthal defrauded the system by submitting false information to obtain benefits. We need not decide whether the gist could be broad enough to include both of these points. The average reader could conclude that the gist of the article was that Rosenthal obtained SNAP benefits by providing false information, both affirmatively and by omission, to the Commission.

false," unless the content of the false statement would not "warn a reasonabl[y] prudent editor or broadcaster of its defamatory potential." *Id.* at 72 (quoting *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 820 (Tex. 1976)).

We agree with the court of appeals' conclusion that Rosenthal has provided sufficient evidence to make a prima facie case of D Magazine's negligence in publishing the article. 475 S.W.3d at 486–87. Rogers testified that D Magazine discussed the substance of the article with the anonymous author and reviewed various public records, such as the affidavit of indigency mentioned in the article, property tax records showing the value of the Park Cities home and the properties in the name of Rosenthal's daughter's living trust, and public records regarding Rosenthal's criminal history. Notably, the article itself recognized that information provided to the Commission is confidential, yet much of the article was premised on personal information about Rosenthal purportedly obtained from the Commission.[8] And the record does not reflect that D Magazine ever contacted the Commission about the article, despite the magazine's assertion in this lawsuit that the article was intended to be a critique of the program administered by that very agency.

Rosenthal testified that, when Rogers called her about the story, she told him that she was being harassed and expressed concern that her harasser was involved in the story. Although Rogers testified that the harasser was not the story's author, he did not expressly dispute her possible involvement, nor did he provide any other details about the author's identity and credentials or how the magazine confirmed the accuracy of the information purportedly obtained from the

_____

[8] No evidence indicates that D Magazine itself was directly involved in obtaining any information from the Commission.

18

Commission. Rosenthal testified that Rogers asked her "what [she] had to say about . . . committing food stamp fraud" but did not ask about any of the article's specific statements. She also testified that she did not return Rogers' call because he told her the magazine "was publishing the Article regardless of what [she] had to say."[9]

In sum, we agree with the court of appeals that Rosenthal presented evidence that D Magazine failed to take reasonable steps to verify the accuracy of the story's gist and should have known the gist was false. We hold that the pleadings and affidavits established a prima facie case of D Magazine's negligence in publishing the story.

## C. Defenses

D Magazine argues that, even if we conclude that Rosenthal established a prima facie case of defamation, it is still entitled to dismissal under the TCPA because it established two affirmative defenses—truth and the fair comment privilege—by a preponderance of the evidence. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(d). We disagree.

First, although truth is generally a defense to defamation, the burden shifts to the plaintiff to prove falsity in cases involving matters of public concern. *Neely*, 418 S.W.3d at 56, 62. Falsity is thus an element of Rosenthal's defamation claim. By contrast, an affirmative defense, such as the statute of limitations, is "based on a different set of facts from those establishing" the cause of action and "defeats the plaintiff's claim without regard to the truth of the plaintiff's assertions." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015) (citations omitted). Because falsity is an element of Rosenthal's claim, at this stage of the proceedings she was required to make

---

[9] D Magazine disputes this assertion, but at this stage of the proceedings we assume its truth.

a prima facie case by clear and specific evidence that the gist of the article was not substantially true. TEX. CIV. PRAC. & REM. CODE § 27.005(c). As discussed, Rosenthal has met this burden.

Second, D Magazine has failed to prove the fair comment privilege applies. The fair comment privilege is an affirmative defense to a defamation action extending to publications that are "reasonable and fair comment[s] on or criticism[s] of . . . matter[s] of public concern published for general information." *Id.* § 73.002(a), (b)(2). We have said that "if a comment is based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege." *Neely*, 418 S.W.3d at 70. In light of our conclusion that a reasonable construction of the article's gist is that Rosenthal fraudulently obtained SNAP benefits, and the Commission's findings that Rosenthal did not act improperly in obtaining those benefits, we hold that D Magazine is not entitled to dismissal based upon the fair comment privilege.

### D. Attorney's Fees

D Magazine argues that the trial court erred in denying its request for attorney's fees under the TCPA, which requires the trial court to award reasonable attorney's fees to the movant if the court dismisses "a legal action" under that Act. *Id.* § 27.009(a)(1). The TCPA defines "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6). As noted, the trial court dismissed Rosenthal's statutory claims, including claims brought on behalf of her minor daughter, but not her defamation claim. The trial court awarded no attorney's fees.

D Magazine makes two arguments on this issue. First, it argues that it was entitled to dismissal of all claims, including the defamation claim, and that the trial court therefore erred in

20

failing to award fees. As we agree with the trial court's refusal to dismiss the defamation claim, we reject this argument.

Second, D Magazine argues that, even if the trial court properly denied its motion to dismiss with respect to Rosenthal's defamation claim, D Magazine is still entitled to an award of attorney's fees with respect to the claims the trial court did dismiss. The court of appeals concluded that it lacked jurisdiction over this issue because the Civil Practice and Remedies Code authorizes interlocutory appeals only of orders *denying* a TCPA motion to dismiss, and D Magazine's claim for attorney's fees is premised on the trial court's partial *grant* of a motion to dismiss. We disagree. The trial court issued a single order that partially denied D Magazine's motion to dismiss, including its request for attorney's fees, and D Magazine was entitled to an interlocutory appeal of that order. *Id.* § 51.014(a)(12) (authorizing an appeal from an interlocutory order that "denies a motion to dismiss filed under [the TCPA]").

Addressing the merits of the argument in the interest of judicial economy, we hold the trial court erred in denying the fee request. The trial court dismissed the statutory claims Rosenthal asserted on behalf of herself and her minor daughter, and each of those claims constituted a "legal action" under the TCPA's broad definition of the term. D Magazine was therefore entitled to an award of reasonable attorney's fees. *Id.* § 27.009(a)(1). We express no opinion on how the continuation of the defamation claim affects the proper amount of such a fee, leaving that to the trial court's discretion on remand.

### IV. Conclusion

Texas and federal law recognize the importance of protecting free speech, particularly on matters of public concern. Still, publications can and do cross the line from protected free speech

21

to actionable defamation. Here, Rosenthal presented clear and specific evidence sufficient to support a prima facie case of defamation. We therefore agree with the trial court and the court of appeals that dismissal of the claim under the TCPA is not warranted at this stage of the proceedings. However, the trial court erred in failing to award D Magazine attorney's fees in light of its dismissal of other claims. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the trial court for further proceedings.

_____

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** March 17, 2017