# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00012-CV

---

**Carole Goldstein, Appellant**

**v.**

**Villas on Travis Condominium Owners' Association, Inc. Board; Pamela Hite; Karla Given; Michelle Bock; Rick Sirles; and Brenda Schroeder, Appellees**

---

**FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-003495, THE HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Carole Goldstein sued Appellees the Villas on Travis Condominium Owners' Association, Inc. Board and its members, Pamela Hite, Karla Given, Michelle Bock, Rick Sirles, and Brenda Schroeder for libel. *See* Tex. Civ. Prac. & Rem. Code § 73.001 (Elements of Libel). Appellees moved to dismiss pursuant to the Texas Citizens Participation Act (TCPA). *See generally id.* §§ 27.001-.011. Following a hearing, the trial court granted the motion to dismiss and awarded Appellees attorney's fees. Goldstein appeals, asserting that the district court erred because (1) she met her burden to establish by clear and specific evidence a prima facie case for each essential element of the claim in question and (2) Appellees failed to establish by a preponderance of the evidence each essential element of a valid defense to her claim. *See id.* §§ 27.005(c), (d). We will affirm the district court's order.

# BACKGROUND

The Villas on Travis (the Villas) is a condominium complex in Travis County, Texas. Goldstein moved into the Villas in January 2016 and shortly thereafter spearheaded an effort to oust the Villas' property manager, Octus, Inc. d/b/a Pioneer Management. Goldstein began regularly attending condominium owners' association meetings, and she collected over $30,000 from owners to retain "local counsel" to terminate and then sue Octus for claims relating to its management of the Villas (the Octus suit). Later in 2016, in response to Goldstein's efforts to terminate Octus, the entire Villas' condominium owners' board resigned and was replaced. Goldstein was appointed (apparently by the counsel she hired) to serve as the board's president. The appointment of the new board members also became the subject of a lawsuit, *Compton v. Gold,*[1] *Bock, and Navar* (the Compton suit). Goldstein alleges that she dedicated six days a week to her voluntary, unpaid role as a board member, during which time she was "involved in the lawsuit against [Octus], as well as other legal matters," including assisting counsel for the Villas "with strategy and drafting of discovery" in at least one of the Villas lawsuits. Specifically, in the Compton suit, Goldstein helped craft interrogatories and requests for production of documents. She also asserts that in November 2018, counsel for the Villas[2] asked her to represent the Villas in Travis County district court for an emergency motion, and, despite not having filed a pro hac vice motion, she did. Goldstein is licensed to practice law in Pennsylvania, but not in Texas.

Goldstein resigned from the board in March 2017 "due to exhaustion from this grueling effort" but continued to attempt to stay involved in the board's litigation. A few months

---

[1] Goldstein sometimes goes by the surname Gold.
[2] Counsel for the Villas at that time was not the attorney currently representing the Appellees in this appeal.

2

after her departure from the board, she requested, among other things, that the board send monthly updates to the entire community regarding the board's ongoing lawsuits and concluded her message with the statement that, absent a full response, she would "reach out to the community at large." The record contains several messages from Goldstein either to the board or board members in which Goldstein emphasizes her thorough knowledge of the board's issues based on her involvement from February 2016 forward. She stated that for "14 months [she] had researched and compiled evidence to support" the Octus lawsuit. In several messages, she advised the board of how to proceed in litigation and implied that, as nonlawyers, they lack the expertise needed to manage the lawsuits despite having counsel. Some of these messages are signed or contain letterhead for "Carole Goldstein, Esq." She sent a lengthy email attachment in September 2017 in which she explained what interrogatories are "under Texas Civil Procedure," and also explained requests for production, admissions, and depositions. She further advised the board as to how to manage the deposition of a key witness in one of the board's lawsuits, including how to staff it with an insurance carrier's attorney and the board's separate counsel. She based her recommendations on her experience of "practicing law for decades" and provided her "professional recommendation" as to how to proceed with discovery in the Compton suit. According to Goldstein, the board "refused to permit [her] any knowledge regarding the litigation from April 1, 2017 through February 11, 2018," and "[a]ll of [her] efforts to assist and / or determine the status of the litigation were rebuked as were third party efforts to have the Board meet with me." She did, however, meet with board members individually following her resignation regarding the ongoing litigation, and she asserted, "As an attorney and the one person who had direct and detailed knowledge of this entire matter from the beginning, I knew I could be of assistance." Although she alleges she was not given information regarding the progression

3

of the board's litigation, she nonetheless was dissatisfied with the board's failure to depose a person named Paul Meisler, a property manager working for Octus, and failure to propound certain interrogatories in the Octus suit. To rectify those concerns, Goldstein informed two board members on separate occasions that she would provide litigation support for $200 per hour and suggested it would save the Villas legal fees to have her assist counsel as she had in the Compton suit. In a February 12, 2018 message to the board's president, Goldstein demanded information on the status of the Octus lawsuit, expressed frustration at the board's failure to allow her to attend a deposition along with the board's attorney, and indicated that absent a full and timely response, she intended to notify the "community at large of her observation of the Board's reluctance to proceed with discovery in a meaningful way."

Because she did not receive a "full and timely reply as requested," Goldstein sent an email on February 14 to all Villas owners, except for the owners who had indicated they did not want to receive mass mailing and the board members. In the letter, Goldstein states her opinions "as a lawyer," discusses the board's ongoing Octus suit, accuses the board of inaction, accuses the board of paying excessive legal fees because the board paid its attorney rather than following Goldstein's suggestion they "stand firm on proof of excessive billing," and accuses the board of being "cloaked behind a false narrative" that providing information to Goldstein might breach confidentiality and adversely affect the board's ongoing litigation. The email closes by calling on the members of the community to request that the board follow Goldstein's advice to depose Paul Meisler and propound discovery in the Octus suit and "please request that I assist in drafting interrogatories and attending the deposition." The letter was forwarded to the board, and the board responded the following day with a letter to Villas owners. The board's response explains that the board had been "advised to maintain confidentiality with respect to all aspects

4

of the case that are not public knowledge," that the board "does not feel it appropriate to ignore competent counsel whose area of expertise is in HOA law," that Goldstein offered to assist with litigation for a fee, and that Goldstein "is not a member of the Texas Bar, and as such cannot practice law in this state." The letter explains that Goldstein's past time with legal counsel "is part of what has led to the current $170,000 (and climbing, albeit much more slowly since April) legal fees assessed to the Villas." It further says that Goldstein had not recently approached the board directly and had not submitted "a proposal, including exactly what she proposes to do, a specific timeline, and what, if anything she requires from the Board," and notes the board's "grave concerns that the relationship moving forward would not be harmonious."

Alleging that the board's response is libel, Goldstein sued Appellees. Appellees moved to dismiss under the TCPA, asserting that even if Goldstein established by clear and specific evidence a prima facie case for each essential element of her libel claim, Appellees had shown entitlement to a valid defense of qualified privilege. The district court granted the motion, and Goldstein appealed.

## DISCUSSION

"The [TCPA] protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). The protection comes in the form of a motion to dismiss a suit that would stifle the defendant's exercise of those rights. *Id.* "Reviewing a TCPA motion to dismiss requires a three-step analysis." *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018). First, the party moving for dismissal must show by a preponderance of the evidence that the TCPA applies to the legal action against it. Tex. Civ. Prac. & Rem. Code § 27.005(b). If the

5

movant meets that burden, the nonmovant must establish by clear and specific evidence a prima facie case for each essential element of its claim. *Id.* § 27.005(c). "The words 'clear' and 'specific' in the context of this statute have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'" *Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 230 (Tex. App.—Austin 2018, no pet.) (quoting *In re Lipsky*, 460 S.W.3d at 590). Collectively, these elements require that the "plaintiff must provide enough detail to show the factual basis for its claim." *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam). If the nonmovant satisfies that requirement, the burden shifts back to the movant to prove each essential element of any valid defenses by a preponderance of the evidence. Tex. Civ. Prac. & Rem. Code § 27.005(d).

The parties do not dispute that the TCPA applies to the libel action against Appellees. Therefore, only the second and third steps of the TCPA analysis are at issue here—whether Goldstein established by clear and specific evidence a prima facie case for each essential element of her libel claim and, if so, whether Appellees proved each essential element of their qualified privilege defense by a preponderance of the evidence. We review de novo whether the parties met or failed to meet their respective burdens of proof under section 27.005. *See Smith Robertson, L.L.P. v. Hamlin*, No. 03-18-00754-CV, 2019 Tex. App. LEXIS 5787 at *5 (Tex. App.—Austin July 11, 2019, no pet. h.) (mem. op.); *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 708 (Tex. App.—Amarillo 2018, pet. denied).

In the second step of the analysis, Goldstein must establish by clear and specific evidence a prima facie case for each essential element of her libel claim. Tex. Civ. Prac. & Rem. Code § 27.005(c). "A libel is a defamation expressed in written or other graphic form . . . ." *Id.* § 73.001. Defamation occurs when "(1) the defendant published a false statement; (2) that

6

defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). In her brief, Goldstein identifies the following seven excerpts from the board's response letter as the basis for her libel claim:

1. Goldstein "held information hostage to her personal desires"

2. Goldstein had "intent to profit . . . [in] violation of the [] 2013 Ethics Policy"

3. Goldstein "cannot practice law in [Texas]"

4. Goldstein's work "is part of what led to the current $170,000 . . . legal fees assessed to the Villas"

5. Goldstein "has not approached the Board directly"

6. Goldstein "refused" to provide the board with a "proposal," something "[a]ny competent lawyer" can do

7. the Board's "confidentiality . . . could be compromised" by Goldstein, "who will publicize any disagreements"

"To establish the defamatory meaning of a publication, courts analyze the gist of the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019) (quoting *D Magazine Partners*, 529 S.W.3d at 434). A publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." *Neely v. Wilson*, 418 S.W.3d 52, 63-64 (Tex. 2013). Statements "that are not verifiable as false cannot form the basis of a defamation claim." *Id.* at 62. Accordingly, we will look at the excerpts identified by Goldstein within the context of the entire letter and in light of the

7

surrounding circumstances in determining whether Goldstein has established a prima facie case for each element of her libel claim.

The first two excerpts identified by Goldstein appear in the fourth paragraph of the board's response letter, after the letter explains that it has been advised to maintain confidentiality with respect to the litigation and that Goldstein had offered to assist with the litigation for a fee based on her special knowledge of the case and special knowledge as a lawyer:

> First of all, anyone whose true intent is to advance a cause does not hold information hostage to their personal desires. If the intent were pure and cost zero, there would be no issue. Secondly, both the withholding of any information of value to the Villas and intent to profit monetarily from information gained while on the Board are violations of the Villas' 2013 Ethics Policy.

Although the statement is couched in general terms, it referred to Goldstein, whose letter the preceding day encouraged her neighbors to demand that the board hire her to assist in specific legal tasks and whose previous correspondence to the board emphasized her special knowledge based on her deep involvement in the Octus suit. As explained in the affidavit of Pamela Hite, this portion of the board's response addressed Goldstein's refusal to further assist with the Octus suit unless the board paid her an hourly fee, which the board declined to do. Hite also explained that the Villas 2013 Ethics Policy prohibited the board from paying Goldstein for her services because Goldstein had gained her special knowledge of the Octus lawsuit through her service as a board member. The Ethics Policy specifically applies to a "Governing Person," which includes certain members of the owners' association in addition to board members. After spending months attempting to persuade the board of her uniquely thorough knowledge of both the law and facts, gained throughout her service to the Villas, Goldstein now argues that her special

8

knowledge of the lawsuit came about from her work from February through October of 2016 rather than from November 2016 through March 2017 as a board member. To the contrary, however, the record shows that her knowledge of the suit continued and increased in the course of her service on the board, during which time she spent, by her own account, six days a week engaged in board service, including copious work on the board's lawsuits. Goldstein herself described her "14 months" of service to the Villas, referring to it as "literally, a 6-day-a-week, 12-15 hours-a-day project"; much of which centered on the Compton and Octus suits. Those "14 months" included her time serving as president of the board, when she became subject to the Ethics Policy. Goldstein described herself as "the one person who had direct and detailed knowledge about this entire matter," and she informed the board that she would not further assist with the Octus suit without compensation. Goldstein has not presented clear and specific evidence that the first two statements of which she complains are false. Thus, these statements do not support her libel claim.

The third allegedly false statement comes from the board's statement that Goldstein "is not a member of the Texas Bar, and as such cannot practice law in this state." In context, we interpret the board's statement to mean that Goldstein cannot legally practice law in Texas. Goldstein acknowledges that she is not licensed in Texas, but she argues that stating that she cannot practice law in Texas is false because she could file a motion to practice pro hac vice. We disagree. Under Rule 19 of the Rules Governing Admission to the Bar of Texas, an attorney "licensed in another state . . . who resides outside of Texas may seek permission to participate in the proceedings of any particular cause in a Texas court by complying with the requirements of Texas Government Code Section 82.0361." Tex. Rules Govern. Bar Adm'n R. 19. The attorney must also file a "sworn motion requesting permission to participate in a particular cause." *Id.*

9

Both Rule 19 and section 82.0361 expressly refer to non-resident attorneys. Tex. Gov't Code § 82.0361; Tex. Rules Govern. Bar Adm'n R. 19. Assuming that Goldstein were eligible to file a pro hac vice motion (which is questionable since she resides in Texas), the record reflects no effort on her part to do so, and there is no requirement that a court grant that motion. In short, Goldstein has not established by clear and specific evidence that the statement is false, so it cannot support her libel claim.

Goldstein also has not established that the fourth statement, that her work or, as the board's letter put it, the "time required by her with paid legal counsel . . . is part of what led to the current $170,000 . . . legal fees assessed to the Villas," is false. Goldstein says that she "was the impetus behind [Octus's] termination" and "the resultant resignation of the board," which resulted in the Octus and Compton suits. She has explained that "a significant part of the referenced $170,000 fees were incurred" defending the Compton suit and paying counsel involved in the transition between property managers and boards. She further asserts that her volunteer work should have been valued between $320,000 and $480,000, based on the rate "likely charged by an experienced outside attorney, had he or she done the same work." Even so, this does not render false the statement that Goldstein's actions were "part of what led to" the Villas' legal expenditures. In her February 14 letter, Goldstein acknowledged that the Octus suit "was never going to be a quick and inexpensive occurrence," and although she faults the board for "settl[ing] by paying [the board's attorney's] fees, which by [her] determination were wrongfully billed," she does not dispute that that the board incurred $170,000 in defending and prosecuting claims in the Octus and Compton suits, in which, according to her statements, she played a pivotal role by providing her time and "legal skills." The fourth statement does not support Goldstein's libel claim.

10

The fifth, sixth, and seventh statements[3] of which Goldstein complains are part of the same section of the board's response letter, in which the board explains that Goldstein had not recently approached the board about working on the board's litigation:

> Thousands of hours have been donated by your current volunteer Board, consisting of well-educated professionals in service to our homes Association. Ms. Gold[stein] has not recently approached the Board directly. Regardless, we respectfully requested Ms. Gold[stein] submit a proposal, including exactly what she proposes to do, a specific timeline, and what, if anything she requires from the Board. Any competent lawyer is capable of estimating time and costs moving forward, and indeed since April we have required that of all counsel with whom we speak. Ms. Gold refused to do so, and has chosen mass email as an alternate means to exert pressure on the Board.
>
> That request (without guarantee of acceptance of the proposal) is still open, though it is becoming concerning that the advised confidentiality maintained by the Board thus far could be compromised by someone who will publicize any disagreements. We also have grave concerns that the relationship moving forward would not be harmonious—always an expensive proposition when lawyers are involved.

Goldstein objects that she had in fact approached the board and certain board members over the course of several months through emails, text messages, and by visiting with individual board members, such that the board should have known by piecing information together that she would be willing to assist them for $200 per hour by directing and participating in the litigation. Because the board would not meet with her, Goldstein also enlisted other Villas owners to contact the board and request that the board meet with her. In context, the statement that

---

3 As stated in Goldstein's brief, the defamatory statements are:
  5. Goldstein "has not approached the Board directly";
  6. Goldstein "refused" to provide the board with a "proposal," something "[a]ny competent lawyer" can do; and
  7. the Board's "confidentiality . . . could be compromised" by Goldstein, "who will publicize any disagreements."

11

Goldstein did not "approach[] the board directly" alludes to Goldstein's efforts to reach the board through some of its more receptive members, through other Villas owners, and through Goldstein's February 14 letter to most of the Villas community. In other words, she did not directly approach the board with a coherent proposal for legal or other services. Goldstein's affidavit complains that at some point, Hite refused to meet with her until Goldstein would provide a written proposal, which Goldstein did not provide. Her most recent communication to the board (rather than the community at large) was the February 12 email to the board president, in which she expressly declined to provide the board a written proposal:

> It is clear that you have wanted me to "audition" for a "part" in this matter. Hence, your demand that [I] submit to you my thoughts on the case and steps going forward. I suspect you would also want Meryl Streep to audition for a high school version of "Iron Lady" having previously received an Oscar for it. If you cannot, or will not, by now know what I can accomplish relative to corruption and the Villas on Travis no written outline from me will open eyes that will not see.

On this record, Goldstein has not established that the board's fifth and sixth statements are false. *See Neely*, 418 S.W.3d at 63-64. Moreover, we determine that in context of the letter and the surrounding circumstances, the statement that Goldstein "has not recently approached the Board directly" did not defame her.

The seventh statement, which Goldstein describes as the Board's concern that "confidentiality . . . could be compromised" by Goldstein, "who will publicize any disagreements" also does not support her libel claim. In two separate communications, Goldstein stated that, should the board not adequately respond, she would inform "the community at large" of her issues with the board, and in her February 14, 2018 letter, Goldstein

12

did exactly that, thereby demonstrating that the board's concern that confidentiality could be compromised by Goldstein's publicizing of disagreements was not unfounded.

Considering, as we must, the entirety of the board's letter and the surrounding circumstances, we conclude that Goldstein has not established by clear and specific evidence that the statements she complains of were false. *See Scripps NP Operating, LLC*, 573 S.W.3d at 790. As a result, Goldstein has failed to establish a prima facie case of libel against Appellees. Having determined that Goldstein has not met the burden of proving her prima facie case, we need not reach the third step of the TCPA analysis regarding Appellees' asserted defense.

## CONCLUSION

We affirm the district court's order.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:   August 29, 2019

13